Filed 5/16/17

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHARLES ANTHONY EDWARDS,<br><br>    Defendant and Appellant. | H042144<br>(Santa Cruz County<br>Super. Ct. No. F22711) |


Defendant Charles Anthony Edwards appeals from a judgment entered after a jury found him guilty of first degree murder (Pen. Code, § 187, subd. (a))[1] and found that he personally used a deadly weapon (§ 12022, subd. (b)(1)).[2] The jury also found that defendant was sane at the time of the murder. On appeal, defendant challenges the sanity finding. We hold that the trial court did not err when it allowed the prosecutor to impeach expert witnesses during the sanity phase with defendant's suppressed statements. The judgment is affirmed.

---

[1]    All further statutory references are to the Penal Code.

[2]    Defendant admitted that he had two prior strike convictions (§ 667, subds. (b)-(i)). The trial court found that defendant had two prior serious felony convictions (§ 667, subd. (a)(1)) and had served two prior prison terms (§ 667.5, subd. (b)). Defendant was sentenced to 88 years to life in prison.

## I. Statement of Facts

### A. Guilt Phase[3]

### 1. Prosecution's Case

At midday on May 7, 2012, defendant attacked Shannon Collins, a woman whom he did not know, as she was walking on Broadway in Santa Cruz. He stabbed her neck and torso 12 times. While Collins bled to death, defendant dropped his jacket and his knife near her body. He nonchalantly walked away and threw his blood-stained shirt into a garbage can. Shortly thereafter, defendant was arrested a few blocks away from the crime scene. Defendant had blood spatter on his hands, head, and shoes.[4]

Defendant was calm and cooperative during the in-field showups, which occurred about an hour after the offense. Defendant was then transported to a hospital for evidence collection procedures during which he was also cooperative. About one and a half hours later, he was transported to the police station where he coherently provided biographical data to the police officers.

### 2. Defense Case

Defendant presented evidence of his extensive history of mental illness. His symptoms included hallucinations, paranoid thoughts, extreme mood fluctuations, and chronically aggressive behavior. Defendant had been given various diagnoses, including schizoaffective disorder bipolar type, schizophrenia, a psychotic disorder not otherwise specified, antisocial personality disorder, and polysubstance abuse. Defendant had engaged in 15 or 16 incidents of violent behavior between 1991 and 2002, many of which were related to his mental illness. Defendant was involuntarily medicated eight times

---

[3]     The jury was instructed that it could consider the guilt phase evidence at the sanity phase.

[4]     The parties stipulated that Collins's blood was found on the knife located at the crime scene and on defendant's shoes. They also stipulated that defendant's DNA was found inside his shoes.

between 1994 and 2011. He met the criteria for the mentally disordered offender program in 1999, 2000, 2002, and 2011. Defendant had no insight into his mental illness and he frequently did not take his medications.[5]

## B. Sanity Phase

### 1. Defense Case

Dr. Jeffrey Gould, a psychiatrist, reviewed documentary evidence and met with defendant. In October 2014, defendant told Dr. Gould that he was hearing voices that told him he was a "liar," a "slouch," and a "piece of shit" on May 7, 2012. The voices began when he woke up that morning and became louder and louder during the day. According to defendant, "the voices were coming from two skeletons that were on the sides of head," and they told him to kill Collins as he stabbed her. Defendant told Dr. Gould that society was against him, and if he remained on the street he would be killed. Defendant believed that if he killed someone, he would be safe and would join the Illuminati cults. Defendant also claimed that the skeletons told him that if he killed someone, he would be free. Jail records, which included a daily account of defendant's behavior and mental condition after the incident, indicated to Dr. Gould that he was suffering from a psychotic disorder. Dr. Gould diagnosed defendant with schizophrenia. Dr. Gould opined that defendant's psychological disorder impaired his knowledge of the

---

[5] The parties stipulated that defendant had the following criminal history. In 1982, a juvenile petition charging him with grand theft from the person and two counts of battery was sustained. In 1986, a juvenile petition charging him with second degree burglary was sustained, and defendant was "sentenced" to the California Youth Authority for eight years. In 1992, defendant was convicted of assault with a deadly weapon. In 1996, defendant was convicted of battery resulting in serious bodily injury. In 1998, defendant was convicted of criminal threats. In 2005, defendant was convicted of attempting to prevent an executive officer from performing his duties by the use of threats or violence or knowingly resisting an executive officer in the performance of his or her duties. In 2007, defendant was convicted of battery on a custodial officer.

3

moral wrongfulness of his conduct. Defendant's delusions caused him to believe that killing Collins was morally right, and he was saving himself from death and persecution. On cross-examination, Dr. Gould acknowledged that he did not consider defendant's interview with the police on May 7, 2012, in reaching his opinion. When Dr. Gould wrote his report, he also did not have the statements that defendant made to Drs. Mark Burdick and Jonathan French, prosecution expert witnesses. Dr. Gould conceded that defendant's statements to the police, Dr. Burdick, Dr. French, and to him were inconsistent, thus raising concerns regarding which version was valid.

Dr. Gould reviewed the video of defendant's statement to the police in which he did not mention the presence of skeletons, anyone telling him what to do, or the Illuminati. Dr. Gould believed that the statement that defendant gave to the police was likely to be the most reliable because it was made closest in time to the murder. Defendant told the police that he had planned to kill a woman because he was frustrated that women did not give him enough attention. He explained that "corrupt" men, men who weighed 300 pounds, and drug dealers received attention from women, but he did not. Defendant stated that he could not take it anymore, and he decided to kill a woman. Defendant also stated that he specifically stabbed Collins twice in the neck first. Dr. Gould conceded that defendant's statement that he would not have killed a teenager or a woman with a child was a moral decision. Defendant told the police that he knew what he did was wrong, that he was going to go to court, and that he would probably receive a life sentence. Defendant stated that he felt bad about what he had done, but he would have felt worse if Collins had had a husband or children. Defendant wrote a letter in the interview room in which he characterized what he did as an awful crime.

Dr. Gould observed that defendant was logical, coherent, and did not mention any psychotic symptoms during the police interview. Defendant's description of events "sounds like someone who is very antisocial and not suffering from other mental

4

illness . . . ." Based on the police interview, Dr. Gould opined that defendant understood the nature of his act and knew legal and moral right from wrong at the time of the murder. However, Dr. Gould did not know whether defendant's statements to the police or to him were more reliable.

Dr. John Greene, a psychiatrist, testified that he evaluated defendant twice in December 2014 and twice in January 2015. Defendant told him that he was experiencing hallucinations and delusions prior to his arrest for murder and described symptoms similar to those that he had described to Dr. Gould. He visualized skeletons on either side of him telling him to kill or he would be killed. Defendant also suffered the delusion that there was a plot against him and that he needed to retaliate. Defendant believed that his life would no longer be in danger after he stabbed Collins. Defendant told Dr. Greene that he ran out of medication after he was released from Atascadero State Hospital in 2012 and was unable to obtain more medication. Defendant had a difficult time providing a rational account of events, which Dr. Greene interpreted to mean that he was "quite psychotic" at the time of the crime.

Dr. Greene noted that there was evidence of psychosis in defendant's interview with the police when he referred repeatedly to the plot against him. When defendant was talking about the crime, he used the words "plot" and "plotting against me" 14 times. Defendant also made three references to being part of a mission and two references regarding his belief that God was instructing him. On cross-examination, Dr. Greene conceded that defendant's statements to the police were linear when he gave his narrative about the crime. But Dr. Greene pointed out that many of defendant's medical records showed that he could be lucid and linear when he was psychotic. He noted that when defendant was left alone in the interview room, he was talking to himself for 10 minutes, which indicated that he was likely having auditory hallucinations. It appeared to Dr. Greene that defendant was suffering from delusions and hallucinations during the

5

interview, which meant that he suffered from those delusions and hallucinations when the crime was committed. Dr. Greene also believed that defendant was trying to hide his symptoms from the police. Dr. Greene diagnosed defendant with schizoaffective disorder, antisocial personality disorder, and substance abuse. Dr. Greene opined that defendant was unable to discern between moral right and wrong at the time of the offense due to his schizoaffective disorder.

## 2. Prosecution Case

Dr. French, a psychologist, diagnosed defendant with schizoaffective disorder and antisocial personality disorder. During an interview in July 2014, defendant told Dr. French that he was hearing voices on the right side of his head before he stabbed Collins, but he did not remember what they said. When asked if he could explain the connection between the voices and the stabbing, defendant said, "[N]o, I can't. She was stabbed?" Defendant also said, "I was really stressed out. I was in town where I didn't know nobody. There was nothing but Whites and Hispanics and I feared for my life." When he was asked why he had chosen Collins, defendant replied, "Why anybody? It could have happened to anybody."

Dr. French also testified regarding the police interview in which defendant described how poorly he had been treated by women and his mission to let society know how miserable he was by taking a life. Defendant told the police about a dozen times that he did not feel good about what he did, but he also stated that he had to complete his mission and he felt relieved after killing Collins. Defendant told the officers that he understood that what he did was legally wrong and he agreed with the statement that what he did was morally wrong. Dr. French read a portion of the transcript of the police interview in which defendant talked about free will and why his life had been designed as it had been. Dr. French characterized defendant's observations as profound. Defendant's statements to the police were "[v]ery significant" to Dr. French in concluding that

6

defendant was sane at the time of the crime. He explained that there was no evidence of active psychosis, and defendant never lost his composure during the lengthy interview. Since the interview was closest in time to the incident, it was the "best window" into defendant's state of mind.

Dr. Burdick, a psychologist, evaluated defendant twice in June 2014 and once in August 2014. Dr. Burdick saw no signs of schizophrenia or schizoaffective disorder at his first interview with defendant. Defendant told him that he had never murdered anyone. He stated that a bald, black man[6] was stabbing a woman and he tried to get the knife away from him. Defendant then helped her to the ground. Defendant also mentioned that there were some voices coming from skeletons, who were on his left and on his right. He did not really understand what the voices were saying, but it was something about killing. They were not commanding him to do anything. When Dr. Burdick asked defendant if killing was wrong, he twice replied, "yes, it's wrong" in an emphatic tone of voice. Defendant also asked Dr. Burdick "how [he] thought it went" and "if [he] believed him."

At the second interview, defendant told Dr. Burdick that he did not have hallucinations at the time of the murder. However, he had hallucinations from time to time depending on his medication. Defendant told him that he had admitted to the police that he had killed the victim, but it was only after they had worn him down after a three-hour interview.

Dr. Burdick testified regarding the police interview. He thought it was important that defendant admitted killing Collins at the beginning of the interview. Dr. Burdick also noted that defendant was lucid during most of the interview. Dr. Burdick concluded that defendant had a mental illness, he understood the nature and quality of his actions, and he knew what he did was legally and morally wrong.

---

[6]     Defendant is a bald, African-American man.

## II. Discussion

Defendant contends that the trial court erred when it allowed the prosecutor to impeach expert witnesses during the sanity phase with his statements that were made after he invoked his right to counsel.

### A. Background

Defendant brought a motion to suppress his statements to the officers on the ground that they were obtained in violation of his Fifth and Sixth Amendment rights, because he had invoked his right to counsel during this interview. The prosecutor opposed the motion. The prosecutor also filed a motion in which she sought admission of the statements at trial and to allow expert witnesses in the sanity phase to refer to the content of defendant's statements to the extent that they formed the basis for their opinions.

The trial court ruled that the statements which defendant made after he invoked his right to counsel were inadmissible in both the guilt and sanity phases. However, the trial court also ruled that if the defense expert witnesses in the sanity phase relied on statements that defendant had made to them, the prosecutor could impeach the expert witnesses with defendant's inconsistent statements that had been suppressed.[7]

### B. Analysis

Prior to custodial interrogations, suspects must be warned that they have the right to remain silent, that any statement they make may be used against them, and that they

_____

[7] During the testimony of the expert witnesses, the trial court instructed the jury: "Statements offered by [defendant] to law enforcement are not being offered for the truth of the matter asserted but they're being offered for part of the basis upon which an expert like Dr. Gould is offering his opinion. So it's being offered for a limited purpose in that regard."

have the right to the presence of an attorney, either retained or appointed. (*Miranda v. Arizona* (1966) 384 U.S. 436, 444 (*Miranda*).) When a defendant invokes his or her right to have counsel present during a custodial interrogation, as in the present case, any statements made in response to further questioning by the police are inadmissible. (*Edwards v. Arizona* (1981) 451 U.S. 477, 484-485 (*Edwards*).) However, the United States Supreme Court has permitted the use of voluntary statements obtained in violation of *Miranda* for impeachment of a defendant's direct or cross-examination testimony. (*Harris v. New York* (1971) 401 U.S. 222, 226 (*Harris*).) As the *Harris* court observed, "'[i]t is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.'" (*Id.* at p. 224, quoting *Walder v. United States* (1954) 347 U.S. 62, 65 (*Walder*).) Under the *Harris* rule, when the officer fails to honor a suspect's invocation of the right to counsel during interrogation, his or her statements are admissible only for impeachment of the defendant. (*Oregon v. Hass* (1975) 420 U.S. 714, 722.)

Defendant contends that *James v. Illinois* (1990) 493 U.S. 307 (*James*), which rejected the expansion of the *Harris* exception to the impeachment of third party witnesses, is controlling. He claims that "*James* set forth a bright line rule with no exceptions or limitations: the impeachment of defense witnesses with illegally obtained evidence is not permitted."

In *James*, the defendant was taken into custody, and admitted during questioning by detectives that he had changed the color and style of his hair after the incident to alter his appearance. (*James, supra*, 493 U.S. at p. 309.) The trial court granted the defendant's motion to suppress his statements which were the fruit of a Fourth Amendment violation. (*Id.* at pp. 309-310.) At trial, witnesses testified that the person

who shot at them had "'reddish' hair, worn shoulder length in a slicked-back 'butter' style," that they had previously seen the defendant with this hair color and style, and that the defendant was the perpetrator of the shooting. (*Id.* at p. 310.) However, the defendant's hair was black and worn in a "'natural'" style at trial. (*Ibid.*) Though the defendant did not testify in his own defense, a family friend testified that the defendant's hair was black on the day of the shooting. (*Ibid.*) The trial court allowed the prosecutor to impeach the defense witness with the illegally obtained statements. (*Ibid.*) The United States Supreme Court held that the admission of the suppressed statements was error. (*Id.* at pp. 309, 320.)

The *James* court reasoned that "[e]xpanding the class of impeachable witnesses from the defendant alone to all defense witnesses . . . would not promote the truth-seeking function to the same extent as did creation of the original exception, and yet it would significantly undermine the deterrent effect of the general exclusionary rule." (*James*, *supra*, 493 U.S. at pp. 313-314.) The court observed that the impeachment exception "penalizes defendants for committing perjury," and leaves them "free to testify truthfully on their own behalf; they can offer probative and exculpatory evidence to the jury without opening the door to impeachment by carefully avoiding any statements that directly contradict the suppressed evidence." (*Id.* at p. 314.) But the court noted that the expansion of the exception to defense witnesses other than the defendant would not result in the same benefits. First, the threat of prosecution for perjury would be more likely to deter a witness from lying on a defendant's behalf than a defendant lying on his own behalf. (*Ibid.*) Second, expanding the exception to include the testimony of these defense witnesses "would chill some defendants from presenting their best defense—and sometimes any defense at all—through the testimony of others." (*Id.* at pp. 314-315.) The court pointed out that a defendant might be reasonably concerned that a witness, who could offer favorable testimony, would also make a statement inconsistent with the

10

defendant's illegally obtained statement, thereby allowing the admission of the suppressed statements. (*Id.* at p. 315.) A "'reluctant'" or "'hostile'" witness likely would not be bothered about refraining from statements that invite impeachment. (*Ibid.*) A "'friendly'" witness might also inadvertently invite impeachment, because he or she was careless or inattentive. (*Ibid.*) Moreover, a defendant does not always have an opportunity to adequately consult or prepare witnesses in advance. (*Ibid.*) Thus, the *James* court concluded that "[g]iven the potential chill created by expanding the impeachment exception, the conceded gains to the truth-seeking process from discouraging or disclosing perjured testimony would be offset to some extent by the concomitant loss of probative witness testimony." (*Id.* at p. 317.)

The *James* court also noted that under the *Harris* impeachment exception, "[l]aw enforcement officers will think it unlikely that the defendant will first decide to testify at trial and will also open the door inadvertently to admission of any illegally obtained evidence. Hence, the officers' incentive to acquire evidence through illegal means is quite weak." (*James*, *supra*, 493 U.S. at p. 318.) However, the expansion of the exception would "vastly increase the number of occasions on which such evidence could be used" and the "prosecutor's access to impeachment evidence . . . would also deter defendant from calling witnesses in the first place." (*Ibid.*) Thus, "obtaining evidence through illegal means stacks the deck heavily in the prosecution's favor." (*Ibid.*) The *James* court held that the impeachment exception would not be extended to third party witnesses, since it "would not further the truth-seeking value with equal force but would appreciably undermine the deterrent effect of the exclusionary rule." (*Id.* at p. 320.)

Here, the use of defendant's illegally obtained statements to impeach the expert witnesses during the sanity phase promotes the same truth-seeking function of a criminal trial as the impeachment exception of a defendant who testifies. Though there is little, if

11

any, concern that expert witnesses would commit perjury,[8] the admission of this evidence prevents the defendant from turning the exclusionary rule into a "a shield against contradiction of his untruths." (*Harris*, *supra*, 401 U.S. at p. 224, quoting *Walder*, *supra*, 347 U.S. at p. 65.) Nor would the admission of the suppressed statements have a chilling effect on a defendant's ability to present a defense. Defendants could avoid impeachment of the testimony of expert witnesses by not providing these witnesses with statements that contradict the suppressed statements. Defendants could reasonably expect that expert witnesses, given their professional qualifications, would not testify in a manner that intentionally or inadvertently invited impeachment. Expert witnesses also generally provide reports prior to trial, thereby allowing adequate preparation by defendants. Moreover, the number of expert witnesses at a criminal trial is usually fewer than other third party witnesses. Thus, in contrast to *James*, the expansion of the impeachment exception to the cross-examination of expert witnesses during the sanity phase would further the truth-seeking process with minimal loss of probative witness testimony.

We are also not persuaded that this type of evidence would diminish the deterrent effect of the exclusionary rule on police misconduct. As with the impeachment exception established under *Harris*, an officer's incentive to gather evidence by illegal means would be weak. Such an incentive would rely on the unlikely prediction that a defendant would later provide inconsistent statements to an expert, who would then basis his

---

[8] The defense witness in *James* testified as to her own observations while, here, the witnesses testified as experts. "An expert witness may be cross-examined about 'the matter upon which his or her opinion is based and the reasons for his or her opinion,'" and "an adverse party may bring to the attention of the jury that an expert did not know or consider information relevant to the issue on which the expert has offered an opinion. [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 434.) When the expert accurately testifies regarding the defendant's statements to him, even if they are false, there is no threat of a perjury prosecution.

12

opinion as to the defendant's sanity on these statements.[9] Moreover, unlike in *James*, the expansion of the exception would not significantly increase the number of occasions on which the prosecutor could use such evidence.

The admission of a defendant's illegally obtained statements to impeach an expert witness regarding inconsistent statements made by the defendant and relied on by the expert witness as a basis for his or her opinion furthers the truth-seeking function of a trial without diminishing the deterrent effect of the exclusionary rule on police misconduct. Thus, the trial court properly admitted the evidence.

Though we are not bound by decisions from courts in other jurisdictions (*People v. Mays* (2009) 174 Cal.App.4th 156, 167), they have reached the same conclusion in interpreting *James*.

*Wilkes v. United States* (D.C. 1993) 631 A.2d 880 (*Wilkes*), involved circumstances similar to those in this case. In *Wilkes*, the defendant presented an insanity defense, and a defense expert testified that his diagnosis of the defendant was based in part on the defendant's statement that he did not remember the events surrounding the shootings. (*Id.* at pp. 882-883.) The prosecutor then cross-examined the expert regarding the defendant's inconsistent statements to the police, which the trial court had ruled were inadmissible under *Miranda*. (*Wilkes*, at p. 883.)

On appeal, the defendant argued that the use of his excluded statements to rebut his expert's diagnosis violated the Fifth Amendment. (*Wilkes*, *supra*, 631 A.2d at p. 885.) The court in *Wilkes* rejected the defendant's argument that *James* barred the impeachment of "*all* defense witnesses," other than the defendant, with excluded

---

[9]     Defendant argues that he was "very obviously mentally ill and uniquely vulnerable to interrogation tactics," and thus, the police would have had little incentive to follow *Miranda* if they had known that they would be able to impeach his witnesses. Here, several witnesses testified that defendant was calm and cooperative with hospital personnel and police officers shortly after the crime was committed.

evidence. (*Wilkes*, at p. 887.) "*James* does not sweep so broadly. We think it more reasonable . . . to read *James* as principally rejecting an overly broad principle [by the state court] rather than establishing one of its own." (*Ibid.*) [10]

In applying the balancing test, the *Wilkes* court began by stating: "We do not think the truth-seeking function of a trial would be served, even marginally, if the medical experts on either side of the case were required to render opinions on complicated issues of mental disability while ignorant of facts essential to a valid diagnosis. Such a result would be beyond the pale of reasonableness and is certainly not mandated by the Fifth Amendment or the decisions of the Supreme Court." (*Wilkes*, *supra*, 631 A.2d at p. 889.) The court next pointed out that the threat of perjury would not affect the defendant and the expansion of the impeachment exception was "not of the same breadth" and could not be "charged with the same infirmities . . . rejected by the Supreme Court in *James*." (*Id.* at p. 890.) The court further found that there was only a "'speculative possibility'" that its decision would encourage police misconduct. (*Ibid.*) Thus, the *Wilkes* court held that the evidence was properly admitted. (*Id.* at pp. 890-891.)

In *State v. DeGraw* (1996) 196 W.Va. 261 [470 S.E.2d 215] (*DeGraw*), the court also considered the issue before us. In *DeGraw*, the defendant relied on a diminished capacity defense. After a defense expert witness testified that the defendant told him that he had no recollection of events on the morning of the offense, the trial court admitted the defendant's statements obtained in violation of *Miranda* to rebut his defense. (*DeGraw*, at pp. 266-267.) The *DeGraw* court agreed with the reasoning of *Wilkes*: "[T]he real witness being impeached is not the defense witness, but the defendant. Consequently, when a defendant offers the testimony of an expert in the course of presenting a defense such as the insanity defense or the diminished capacity defense, which calls into question

---

[10] The dissent in *Wilkes*, *supra*, 631 A.2d 880 concluded that the broad language in *James* did not allow a balancing of interests in determining whether a defense witness could be impeached with illegally obtained evidence. (*Wilkes*, at p. 893.)

14

the defendant's mental condition at the time the crime occurred, and the expert's opinion is based, to any appreciable extent, on the defendant's statements to the expert, the State may offer in evidence a statement the defendant voluntarily gave to police, which otherwise is found to be inadmissible in the State's case-in-chief, solely for impeachment purposes either during the cross-examination of the expert or in rebuttal, even though the defendant never takes the witness stand to testify. [Citation.]" (*DeGraw*, at p. 270.)

Defendant relies on *People v. Andreasen* (2013) 214 Cal.App.4th 70 (*Andreasen*) to support his position. In *Andreasen*, the defendant was charged with murder and raised an insanity defense. (*Id.* at p. 73.) The prosecutor sought to admit a videotaped conversation between the defendant and the officers who were guarding him. (*Id.* at p. 83.) Defense counsel argued that the evidence was inadmissible under *Miranda*. (*Andreasen*, at p. 83.) The trial court ruled that the evidence, except for the portion in which the defendant invoked his *Miranda* rights, was admissible during the sanity phase. (*Andreasen*, at p. 85.) The *Andreasen* court held that there was no error, because there was no *Miranda* violation. (*Andreasen*, at p. 89.)

Defendant focuses on the court's statement in *Andreasen* that "[g]enerally, statements elicited in violation of . . . *Miranda* principles may not be used against the defendant at trial [citation], including to rebut a sanity defense [citations]." (*Andreasen*, *supra*, 214 Cal.App.4th at p. 86.) However, the *Andreasen* court did not consider whether a statement obtained in violation of *Miranda* would be admissible to impeach an expert as to the basis for his or her opinion. "[I]t is axiomatic that cases are not authority for propositions not considered. [Citations.]" (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1176.)

Defendant next analogizes this case to *People v. Weaver* (2001) 26 Cal.4th 876 (*Weaver*). In *Weaver*, the California Supreme Court held that the testimony of the experts who evaluated the defendant's competency to stand trial was inadmissible at the

15

sanity phase, because the "defendant was not permitted to invoke his constitutional right against compelled self-incrimination" before he made statements to these experts. (*Id.* at p. 961.) Defendant claims that the same concerns regarding the admission of a statement obtained in violation of the Fifth Amendment apply in present case.

The *Weaver* court observed that " '[t]he purpose of [an] inquiry [into competency] is not to determine guilt or innocence. It has no relation to the plea of not guilty by reason of insanity. Rather, the sole purpose . . . is the humanitarian desire to assure that one who is mentally unable to defend himself not be tried upon a criminal charge.' " (*Weaver*, *supra*, 26 Cal.4th at pp. 959-960, quoting *Tarantino v. Superior Court* (1975) 48 Cal.App.3d 465, 469.) The court also stated that "the rule of immunity 'is necessary to ensure that an accused is not convicted by use of his own statements made at a court-compelled examination. The rule also fosters honesty and lack of restraint on the accused's part at the examination and thus promotes accuracy in the psychiatric evaluation. Hence, the rule protects both an accused's privilege against self-incrimination and the public policy of not trying persons who are mentally incompetent.' " (*Weaver*, at p. 960, quoting *People v. Arcega* (1982) 32 Cal.3d 504, 522.)

The policy concerns articulated in *Weaver* and those in the present case have significant differences. In contrast to the rule of immunity precluding the use of a defendant's statements to competency experts at trial, the statements obtained in violation of *Edwards* were not compelled by the trial court, and they would have no effect on the trial court's duty to determine whether a defendant was competent to stand trial. The illegally obtained statements in this case are also related to the issue of guilt. Moreover, "[t]he United States Supreme Court has carved out exceptions to the exclusionary rule upon 'recognition that the concerns underlying the *Miranda* . . . rule must be accommodated to other objectives of the criminal justice system.' [Citation.]" (*People v. Johnson* (2010) 183 Cal.App.4th 253, 281.) The truth-seeking function of criminal trials

16

is one such objective. (*Harris*, *supra*, 401 U.S. at pp. 225-226.) As previously discussed, the use of the suppressed statements in this case promoted the truth-seeking function of the trial without diminishing the deterrent effect of the exclusionary rule on police misconduct.

## III.    Disposition

The judgment is affirmed.

_____
Mihara, J.

WE CONCUR:


_____
Elia, Acting P. J.


_____
Bamattre-Manoukian, J.


*People v. Edwards*
H042144

18

Trial Court:                                                   Santa Cruz County Superior Court

Trial Judge:                                            Honorable Timothy R. Volkmann

Attorney for Defendant and Appellant:        Marcia Rachel Clark
Under Appointment by the Sixth
District Appellate Program

Attorneys for Plaintiff and Respondent:      Kamala D. Harris
Attorney General of California

Gerald A. Engler
Chief Assistant Attorney General

Jeffrey M. Laurence
Senior Assistant Attorney General

Seth K. Schalit
Supervising Deputy Attorney General

Victoria Ratnikova
Deputy Attorney General

*People v. Edwards*
H042144