**FILED**
**AUGUST 20, 2013**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 30738-7-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| SEBASTIAN CORTES AGUILAR, | ) | |
| | ) | |
| Appellant. | ) | |

KULIK, J. — After confronting his wife about her telephone conversation with another man, Sebastian Cortes Aguilar[1] stabbed and killed his wife. Mr. Cortes also cut his daughter as she attempted to block her father from attacking her mother. A jury found Mr. Cortes guilty of first degree murder of his wife and second degree assault of his daughter. Mr. Cortes appeals. He contends that the evidence was not sufficient to establish the premeditation element of first degree murder. He also contends that the evidence was not sufficient to establish that he intentionally assaulted his daughter. Finally, Mr. Cortes challenges the condition of community custody that prohibits him

---

[1] Sebastian Cortes Aguilar signed his judgment and sentence as "Sebastian Cortes."

from contacting his children for 10 years. We conclude that Mr. Cortes's challenges are without merit and affirm the trial court in all respects.

## FACTS

In August 2011, Mr. Cortes and his wife, Ortencia Arroyo Alejandre, argued in their Chelan County home. Mr. Cortes stabbed Ms. Arroyo Alejandre at least five times. She died at the home from her injuries. The couple's 13-year-old daughter was also cut during the argument. Wenatchee police arrested Mr. Cortes and charged him with first degree murder of Ms. Arroyo Alejandre and first degree assault—domestic violence, of their daughter.

At trial, Officer Keith Kellogg testified that he interviewed Mr. Cortes regarding the death of Ms. Arroyo Alejandre. Mr. Cortes told Officer Kellogg that Ms. Arroyo Alejandre was holding a knife to peel a cucumber when Mr. Cortes voiced his suspicions about her talking to a man on the telephone. Ms. Arroyo Alejandre became upset and struck out at Mr. Cortes with the knife, cutting him on the hand. Mr. Cortes told Officer Kellogg that Ms. Arroyo Alejandre threatened to kill him, so he grabbed the knife and attacked her to prevent being harmed or killed. Mr. Cortes stated that he intended to stab Ms. Arroyo Alejandre in the throat, but did not think that he would kill her if he stabbed her in that area. Mr. Cortes said that he acted out because of Ms. Arroyo Alejandre's

2

words and actions. Officer Kellogg testified that he saw cuts to Mr. Cortes's hand and shoulder, which according to Mr. Cortes, came from Ms. Arroyo Alejandre.

During the interview, Mr. Cortes also said that he remembered his daughter getting in the middle of the argument, but did not remember cutting her during that process and that it must have been an accident. He said everything happened really quickly.

The daughter witnessed the violent argument between her parents. She testified that she was listening to the television and could hear her parents arguing in another room. When she heard a bottle crack, she turned off the television and ran into the living room. She witnessed her father punching her mother and beating her mother with a belt. Her father ran into the kitchen, and the daughter attempted to pick up her mother and take her away from the house. The daughter testified that she knew her father was going to get a knife because she had observed him do it before.

The daughter said her father caught up with them and pulled them into a corner. The daughter positioned herself in front of her mother. Her father then "started, like, throwing the knife, like, trying to punch her and I was trying to hit him so he would stop." Report of Proceedings (RP) at 330. The daughter saw her father hit her mother with the knife. When the daughter turned around, she saw her mother covered in blood. The

3

daughter's arm was cut during the attack, although she did not realize it at the time. She did not believe that her father was aiming the knife at her.

The couple's son also witnessed the argument and testified at trial. He stated that he was in the kitchen when he heard the bottle crack. He went into the living room and saw his sister trying to protect his mother. He also saw his father pulling his mother's hair. When Mr. Cortes went to get a knife, the son called 911. He heard his mother screaming. When he saw his mother next, she was bleeding from the neck and unconscious.

A neighbor testified that he saw a man, covered in blood, come out of the residence and drive away from the scene in a hurry. He also saw a girl come out and yell, "'Daddy, don't leave.'" RP at 313.

The children's godfather, Jorge Torres Cortes, testified that Mr. Cortes called him and asked to hide in his garage. Mr. Torres asked what happened, and Mr. Cortes responded that he killed his wife.

Officer Jared Reinfeld was the first officer to arrive at the scene. He testified that the daughter came out of the basement of the home, screaming and soaked in blood. Officer Reinfeld followed the daughter as she ran back inside. The daughter was holding

4

her mother in her lap, screaming that her mother was dead. When Officer Reinfeld asked the daughter who did it, she responded that her dad killed her mom.

Emergency medical technician, Aaron Jacobs, testified that he was dispatched to the scene. When he entered the apartment, he saw the daughter clinging to her mother and crying hysterically. He also noticed that both Ms. Arroyo Alejandre and the daughter were completely covered in blood, as well as the walls where they were located. Mr. Jacobs and his team initiated basic life support but were unable to resuscitate Ms. Arroyo Alejandre. Ms. Arroyo Alejandre was pronounced dead at the scene.

Dr. Jonathan Kim, an emergency medicine physician, testified that on the date of the incident, he treated a stab wound on a 13-year-old girl. He stated that she was tearful and emotional when he observed her. She made a statement that her father had become drunk and slit her mother's throat because he thought her mother had been cheating on him. She said she was trying to hold her mother and, at some point in the process, she was cut. Dr. Kim testified that the girl's wound was deep and serious. He believed that the wound was caused by a knife.

Forensic pathologist, Dr. Gina Fino, performed the autopsy of Ms. Arroyo Alejandre. She testified that multiple sharp force injuries were present on Ms. Arroyo Alejandre's body. The first wound that Dr. Fino described was a penetrating stab wound

5

to the anterior of the neck, caused by a knife. This wound continued under the collarbone and appeared to end in the right anterior upper lung lobe, making a visible cut mark in the lung. The wound was about six inches deep.

The second wound was a two-inch curved penetrating stab wound to the upper right chest. The wound was six inches deep, punctured the right lung, and left tool marks on the rib. Dr. Fino also testified to three other upper body stab wounds, ranging from three to six inches deep. One of the stab wounds that punctured Ms. Arroyo Alejandre's lung caused blood to accumulate in her chest cavity.

Dr. Fino testified to other superficial sharp force injuries on Ms. Arroyo Alejandre's upper chest area. She also testified to an injury to Ms. Arroyo Alejandre's forehead that went completely through her skin and made a mark on her skull. Dr. Fino found defensive wounds on Ms. Arroyo Alejandre's hand and arms. She associated these wounds with Ms. Arroyo Alejandre using parts of her body to block an injury.

Dr. Fino concluded her testimony by saying that the mechanism of death was bleeding from the stab wounds. She also recognized damage to the lungs. Her conclusion was that Ms. Arroyo Alejandre died from multiple stab wounds to the neck and chest.

6

The State rested. Mr. Cortes moved to dismiss the first degree assault charge. He argued that the information alleged an intentional assault against his daughter, but the evidence did not indicate that Mr. Cortes intended to assault his daughter. Mr. Cortes also argued that his assault of Ms. Arroyo Alejandre was the intended crime, and that intent could not be transferred to his daughter because the information did not contain transferred intent language. The trial court agreed with Mr. Cortes's argument. However, instead of ordering dismissal, the court allowed the State to amend the charge to second degree assault for the injury to the daughter. The information alleged that Mr. Cortes, "with intent to commit a felony, did then and there unlawfully, feloniously, ~~and intentionally~~ assaulted [the daughter]." Clerk's Papers (CP) at 31. The amendment was made without objection.

A jury found Mr. Cortes guilty of first degree murder—domestic violence, and second degree assault—domestic violence. The jury also found by special verdict that Mr. Cortes was armed with a deadly weapon in commission of the crime and that Mr. Cortes and Ms. Arroyo Alejandre were members of the same household. The trial court sentenced Mr. Cortes to 371 months of confinement, which included a 24-month weapon enhancement to the first degree murder conviction. The court also ordered a 10-year no contact order for the children.

7

Mr. Cortes appeals. He contends that the evidence does not establish all of the elements of first degree murder. He also contends that the trial court erred by allowing the State to amend the information, and that the evidence does not support the second degree assault conviction against his daughter. Last, he challenges the imposition of the 10-year no contact order between Mr. Cortes and his children.

## ANALYSIS

*Sufficient Evidence of Premeditation.* Mr. Cortes contends that his first degree murder conviction should be reversed because the State failed to prove the premeditated intent element of the crime.

The standard of review for a sufficiency of the evidence challenge in a criminal case is "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Bingham*, 105 Wn.2d 820, 823, 719 P.2d 109 (1986) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). A defendant challenging sufficiency of the evidence "admits the truth of the State's evidence and all inferences that can reasonably be drawn from that evidence." *State v. Gentry*, 125 Wn.2d 570, 597, 888 P.2d 1105 (1995).

In a criminal prosecution, the Fourteenth Amendment's due process clause requires the State to prove each essential element of the crime charged beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

To convict of first degree murder, the State is required to prove that Mr. Cortes caused the death of the victim, that he intended to cause the death, and that he acted with premeditated intent. *State v. Ortiz*, 119 Wn.2d 294, 313, 831 P.2d 1060 (1992).

Premeditation distinguishes first and second degree murder. *State v. Brooks*, 97 Wn.2d 873, 876, 651 P.2d 217 (1982). "Premeditation" involves a deliberate formation of and reflection upon the intent to take a human life and includes the mental process of thinking beforehand, deliberation, reflection, and weighing or reasoning for a period of time, however short. *Gentry*, 125 Wn.2d at 597-98 (quoting *State v. Robtoy*, 98 Wn.2d 30, 43, 653 P.2d 284 (1982); *State v. Ollens*, 107 Wn.2d 848, 850, 733 P.2d 984 (1987)). Factors relevant to establish premeditation include motive, procurement of a weapon, stealth, and method of killing. *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995).

Both direct and circumstantial evidence can be used to establish premeditation. *Bingham*, 105 Wn.2d at 823-24. "Circumstantial evidence can be used where the inferences drawn by the jury are reasonable and the evidence supporting the jury's verdict

9

is substantial." *Id.* at 824. A wide range of proven facts will support an inference of premeditation. *State v. Finch*, 137 Wn.2d 792, 831, 975 P.2d 967 (1999).

In *Ortiz*, the court found sufficient evidence of premeditation where the killing was committed with a knife that was procured on the premises, but obtained from another room. *Ortiz*, 119 Wn.2d at 312-13. The murder occurred in a bedroom, and not the kitchen where the knife was found. *Id.* at 313. Additionally, the victim had multiple wounds, was struck in the face with something other than the knife, and the defensive wounds found on the victim provided evidence of a prolonged struggle. *Id.* at 312-13.

Here, sufficient evidence of premeditation can be inferred from the facts. The evidence establishes that Mr. Cortes had a motive to kill his wife—her possible involvement with another man. Mr. Cortes said during a police interview that he was suspicious about Ms. Arroyo Alejandre's telephone conversation with another man, and Dr. Kim testified that the daughter said the attack occurred because her father thought her mother had been cheating on him.

Also, Mr. Cortes had time to reflect on his actions before killing Ms. Arroyo Alejandre. He began the attack on his wife by hitting her. Then, similar to *Ortiz*, Mr. Cortes instituted his plan to kill his wife by leaving the living room to procure a weapon, a knife, from the kitchen. He returned to the living room with the knife and stopped her

10

from leaving. Mr. Cortes continued the attack on his wife with the knife, stabbing her multiple times. The evidence indicates his use of stealth, as Mr. Cortes stabbed his wife even though his 13-year-old daughter attempted to block the attack by standing between Mr. Cortes and his wife.

Last, Mr. Cortes's lengthy and excessive attack provides evidence of premeditation. Mr. Cortes inflicted five deep wounds and other defensive wounds, indicating a violent, prolonged struggle. Three of the wounds punctured Ms. Arroyo Alejandre's lung, a vital organ. He intended to stab her in the throat, although he claims that he did not expect the stabbing to kill her. After the attack, Mr. Cortes had the presence of mind to leave his home where the attack took place and to ask for help in hiding from law enforcement.

The facts in this case are sufficient for a rational jury to have found beyond a reasonable doubt that Mr. Cortes considered his actions for the requisite time before killing Ms. Arroyo Alejandre. The evidence is sufficient to support jury's verdict that Mr. Cortes's murder of his wife was premeditated.

*Amended Information.* Mr. Cortes contends that the trial court erred by allowing the State to amend the information after it closed its case in chief.

11

The State cannot amend the information to charge a different or greater crime or add an essential element of a crime once it rests its case in chief. *State v. Kirwin*, 166 Wn. App. 659, 673, 271 P.3d 310 (2012). However, the State may amend the information after it rests its case in chief if the amendment is to a lesser degree of the same crime or a lesser included offense. *State v. Pelkey*, 109 Wn.2d 484, 491, 745 P.2d 854 (1987).

For the crime of assault, lower degrees of assault are considered lesser degree offenses of all higher degrees of assault. *State v. Foster*, 91 Wn.2d 466, 471-72, 589 P.2d 789 (1979). And the jury can be instructed on lesser included offenses even without an amendment to the information. Because second degree assault is a lesser degree of first degree assault, the amendment was not improper.

*Sufficient Evidence of Second Degree Assault.* Mr. Cortes contends that the State failed to establish the intent element for second degree assault, specifically that Mr. Cortes intended to assault his daughter. Mr. Cortes maintains that the doctrine of transferred intent was not included in the information and, therefore, cannot be used to transfer Mr. Cortes's intent to harm the victim, Ms. Arroyo Alejandre, to his daughter.

The second degree assault elements relevant here are (1) an assault and (2) intent to commit a felony. RCW 9A.36.021(1)(e). Washington recognizes three definitions of assault: "'(1) an attempt, with unlawful force, to inflict bodily injury upon another; (2) an

12

unlawful touching with criminal intent; and (3) putting another in apprehension of harm whether or not the actor intends to inflict or is incapable of inflicting that harm.'" *State v. Aumick*, 126 Wn.2d 422, 426 n.12, 894 P.2d 1325 (1995) (quoting *State v. Walden*, 67 Wn. App. 891, 893-94, 841 P.2d 81 (1992)).

Under the doctrine of transferred intent, once the intent to inflict harm on one victim is established, the mens rea transfers to any other victim who is actually assaulted. *State v. Clinton*, 25 Wn. App. 400, 403, 606 P.2d 1240 (1980). "Moreover, transferred intent is applicable to second degree assault charges involving an accidental or unintended victim." *State v. Wilson*, 113 Wn. App. 122, 131, 52 P.3d 545 (2002).

In *Clinton*, Mr. Clinton was intentionally swinging a pipe at Mr. Miller when the pipe slipped and hit Ms. Miller. *Clinton*, 25 Wn. App. at 401-02. Mr. Clinton was charged with and convicted of the second degree assault of Ms. Miller. *Id.* at 401. The jury was instructed on the theory of transferred intent. *Id.* Mr. Clinton contended that the jury instruction was misleading because it allowed the jury to convict him without finding that he acted knowingly in his assault of Ms. Miller. *Id.* at 402. The Court of Appeals approved the jury instruction and confirmed the conviction, concluding that the transferred intent instruction allowed the jury to convict Mr. Clinton, "if, with the intent to assault the victim's husband, he mistakenly, accidentally, or inadvertently struck the

victim instead." *Id.* at 403.

Also in *Clinton*, Mr. Clinton argued that he was not sufficiently advised of the nature of the charge because he was charged with "knowingly" assaulting Ms. Miller. *Id.* at 403-04. The court rejected this contention based in part on the common-law acceptance of the transferred intent doctrine. *Id.* at 404. The court concluded that Mr. Clinton was sufficiently and adequately prepared to defend against the charge. *Id.*

In Mr. Cortes's trial, jury instructions defined "assault" as "an intentional touching, striking, or cutting of another person that is harmful or offensive." CP at 79. The jury was also given an instruction on transferred intent, stating:

> If a person acts with intent to assault another, but the act harms a third person, the actor is also deemed to have acted with intent to assault the third person.
> The State is not required to prove that the person actually injured is the person whom the defendant intended to injure.

CP at 86.

We conclude that sufficient evidence supports Mr. Cortes's conviction for second degree assault against his daughter. Specifically, the evidence is sufficient to establish the element of intent. As in *Clinton*, and in light of the jury instructions, the jury was permitted to conclude that Mr. Cortes's intent to assault Ms. Arroyo Alejandre transferred to his daughter. Evidence of such intent was presented at trial. According to Officer

14

Kellogg, Mr. Cortes admitted that he intended to injure Ms. Arroyo Alejandre with a knife. Mr. Cortes injured his daughter as she tried to block the assault. Therefore, based on the doctrine of transferred intent, there is sufficient evidence to support the conviction for second degree assault.

*No Contact Order.* Mr. Cortes contends that the no contact order is erroneous because his children were not victims of the crime. He also contends that the trial court failed to make findings or apply a legal standard before entering the no contact order.

A trial court's decision to impose crime-related prohibitions is reviewed for an abuse of discretion. *In re Pers. Restraint of Rainey*, 168 Wn.2d 367, 374, 229 P.3d 686 (2010). Even with this standard, a court will more carefully review a condition that interferes with a fundamental constitutional right. *Id.*

In Washington, a court may impose "crime-related prohibitions" as conditions of a sentence. RCW 9.94A.505(8). Conditions on a sentence that impose limitations on a fundamental right must be "sensitively imposed" so that they are "reasonably necessary to accomplish the essential needs of the State and public order." *State v. Warren*, 165 Wn.2d 17, 32, 195 P.3d 940 (2008).

Parents have a fundamental liberty interest in the care, custody, and control of their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599

15

(1982). A court may impose a condition on a criminal sentence that restricts a fundamental right to parent if the condition is reasonably necessary to prevent harm to a child. *State v. Ancira*, 107 Wn. App. 650, 654, 27 P.3d 1246 (2001). "Prevention of harm to children is a compelling state interest, and the State does have an obligation to intervene and protect a child when a parent's 'actions or decisions seriously conflict with the physical or mental health of the child.'" *Id.* at 653-54 (quoting *In re Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980)).

Despite Mr. Cortes's contentions, the trial court did address the reason for imposing the no contact order. Before entering the sentence and no contact order, the trial court summarized the crucial evidence and pondered the impact the events would have on the children. The trial court recounted that witnesses testified to the horrific, bloody scene where the daughter was found holding her mother. The court recognized that the children witnessed their father kill their mother. The court pointed out that Mr. Cortes left the house despite his daughter's pleas to stay and that his first instinct was to ask a family friend for a place to hide. Additionally, Mr. Cortes stabbed his daughter, making her a direct victim, too.

Finally, the trial court acknowledged Mr. Cortes's failure to take responsibility for the killing. Mr. Cortes told the court during the sentencing hearing that the events were

16

not his fault because Ms. Arroyo Alejandre was hiding things from him. Mr. Cortes stated if she had not hidden things, he would not be here today. The trial court noted that Mr. Cortes's violent attack on his wife was an act of domestic violence, as established by the jury's findings.

Based on these facts, the trial court did not abuse its discretion by imposing a 10-year no contact order between Mr. Cortes and his children. The State had a compelling interest in protecting the children from reliving the emotional trauma associated with their mother's death. The court recognized that both children were victims of the crime, either directly or indirectly, and that the children experienced distress by witnessing the event and having to testify against their father. The children are subject to further distress because Mr. Cortes continues to place blame on the children's mother, and this action seriously conflicts with the mental health of his children. Furthermore, the 10-year length of the no contact order allows Mr. Cortes to regain contact with his children when the children are at a more mature age and can address their relationship with their father in light of the events that occurred. The condition was reasonably necessary to protect the emotional well being of the children.

No. 30738-7-III
*State v. Cortes*

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

In his statement of additional grounds, Mr. Cortes contends that he received ineffective assistance of counsel because his attorney did not act on Mr. Cortes's instructions. He also contends that his attorney, the prosecutor, and the judge acted inappropriately by conversing in private, that the prosecutor accepted a bribe, and that a juror was unexpectedly missing on the last day of trial. We find no support in the record for these contentions. Thus, we find no error.

We affirm the convictions for first degree murder and second degree assault.

_____
Kulik, J.

WE CONCUR:


_____
Korsmo, C.J.


_____
Siddoway, J.

18