# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>WENDELL ALLEN WILSON,<br><br>Appellant. | No. 84551-9-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

BIRK, J. — Wendell Wilson appeals his criminal conviction for shooting and killing Lila Wilson, asserting that during a police interrogation he unequivocally invoked his right to counsel under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). We conclude he did. Wilson stated, "I'm going to have to ask for legal representation"—words that courts have regularly found to constitute an unequivocal invocation of Miranda rights. The State argues Wilson's use of those words was not unequivocal, because the context known to the questioning officers was that Wilson had already waived Miranda once, he had already admitted the shooting to police and others, and his reference to counsel was building to a question about how long it would take to get a lawyer. We hold the context did not confound Wilson's clear request for a lawyer, his statements in the interrogation were required to be suppressed, and the admission of his statements at trial was not harmless beyond a reasonable doubt. We reverse Wilson's conviction and remand.

I

A

Before he made the statements challenged on appeal, Wilson described certain facts of the shooting in a series of calls to his ex-wife Gay Horton and 911, and then to police officers responding to the scene.

Horton testified that on June 10, 2019, Wilson and Horton spoke over the phone three times. Scene photos showed officers found a handwritten address book open to a page showing Horton's address and phone number. In the first phone call, Wilson called Horton and angrily said, " 'I'm going to kill Lila.' " Lila Wilson was Wilson's adult daughter, and lived in an apartment with Wilson, her husband, and her then 14 month old son, S. Because of Wilson's history of arguments with Lila Wilson, Horton did not take the threat seriously and responded, " 'Okay, what did she do now?' " Wilson hung up. Horton called him back after about three minutes, and Wilson said, " 'I killed Lila. I shot her.' " Horton testified his demeanor and tone changed during this second call, because he was breathing really hard and may have been in shock. Horton could not remember where the break was between the second and third calls, but they were very close in time and she recalls asking more details about what was going on. At Horton's request, Wilson indicated he would call 911.

Wilson informed the 911 operator that he needed social services for a baby because he " 'just killed her—the baby's mother' " using a gun. When the 911 operator asked why he shot the mother, Wilson stated, " 'She's been given—we've been having a lot of arguments and today it just finally got totally out of hand.' "

The argument centered on putting up a baby fence in the kitchen. The 911 audio ends after approximately six minutes with the arrival of police directing Wilson to put his "hands up" and put "the child down."

Officer Edward Sagiao responded to Wilson's 911 call and was one of the first officers to come into contact with him. Officer Sagiao's interactions with Wilson were partially captured on his patrol car's dashboard video camera. The first minute of the dashcam video captures Officer Sagiao's instructions, heard at the end of the 911 call, to Wilson to put his hands up and the child down, followed by officers taking Wilson into custody outside the apartment. A pretrial exhibit of an extended version of this video included Officer Sagiao reading Wilson his Miranda rights. Wilson waived his rights and agreed to speak with the officer. As to time, Detective Christopher Edwards testified at the CrR 3.5 hearing that he heard about the incident at approximately 5:00 p.m.

Responding authorities found the gun and, inside the apartment, a deceased person later identified as Lila Wilson, who had been shot several times. Wilson told Officer Sagiao the location of the gun and described an argument about installing a baby gate in the kitchen for S. as the reason he shot her. Wilson stated Lila Wilson did not want to hear about his opinion that S. would pull the gate down and hurt himself, "then she started to escalate," she said, "I'm leaving right now. I'm [sic] just want to go," and then she went into the bedroom and slammed the door in Wilson's face. After that, "I went and got my gun, and I shot her," "several times, several places." When asked if the gun was locked, Wilson responded, "No . . . it was up in the closet, way up on the shelf totally out of reach of any children."

3

Officer Sagiao believed it was Lila Wilson's room where Wilson retrieved the gun. Officer Sagiao testified he believed he asked Wilson if he intended to kill Lila Wilson and believed Wilson said he did. Officer Sagiao described Wilson's demeanor at the scene as "very calm" and "polite." After approximately 20 minutes, Officer Sagiao arrested Wilson. The dashcam video continues for approximately four more minutes. Another, 13 minute video shows Wilson being transported to the police station.

The interrogation video shows Wilson entering an interview room with Detective Edwards at 5:43 p.m. In the first minute of the video, Wilson asks for confirmation that Detective Edwards is a detective. Within approximately another minute, Detective Tracy Jared enters the room. The following exchange took place starting at 5:45 p.m. during which Wilson asserts he unequivocally invoked his right to counsel:

> "DETECTIVE EDWARDS: All right. So no questions. A little bit of calmness here which is good. So like I told you, . . . I met you at the scene and this is Detective Jared. What we're here to do is just try to get everybody's input of what happened. Because, we know we weren't there, that sort of thing. But before we do that, I know that you were spoken to at the scene by Officer Sagiao. And you were already given your Miranda rights; right?
> MR. WILSON: Correct.
> DETECTIVE EDWARDS: Okay. Do you remember understanding those rights?
> MR. WILSON: Yes.
> DETECTIVE EDWARDS: Okay. . . . [Y]ou're gonna have to hear them again, because I'm going to read them to you again, just to make sure you understand them. I'm going to read them slow. If you have any questions, just let me know, okay, Wendell? And you're okay if I call you—

4

MR. WILSON: Why (cross talk)[1]—that's my name. Wendell is my name.

DETECTIVE EDWARDS: Yeah. Do you want me to call you Mr. Wilson or Wendell?

MR. WILSON: Whichever you're comfortable with.

DETECTIVE EDWARDS: Okay. Okay. Go ahead.

MR. WILSON: Um . . . I know I can't afford a lawyer.

DETECTIVE EDWARDS: Okay.

MR. WILSON: *So I'm going to have to ask for legal representation, not out of resistance or*—or—anything

DETECTIVE EDWARDS: Mm-hmm.

MR. WILSON: But, to get my—I just don't know where—where you stop. Once you start answering questions—

DETECTIVE EDWARDS: Understandable.

MR. WILSON: —then a lawyer becomes real—rather—I mean—

DETECTIVE EDWARDS: Well, yeah.

MR. WILSON: It doesn't, help, is what I'm trying to say. *How long would it take me to get a lawyer for*?

DETECTIVE EDWARDS: Well, you won't have one tonight—

MR. WILSON: Now that's for sure.

DETECTIVE EDWARDS: Yeah, but will you have one. I mean, you're guaranteed one, right?

MR. WILSON: By the law.

DETECTIVE EDWARDS: Oh, of course. The law will guarantee—guarantee you one. Whether you can afford one or not—and that's part of the rights that I—I read to you.

MR. WILSON: Right.

DETECTIVE EDWARDS: So—I tell you what, let me go ahead and read them to refresh your memory. And then, . . . if you decide, then we'll decide what to do after that. Okay?

MR. WILSON: Yeah.

DETECTIVE EDWARDS: Just so—at least I can say I've read them to you.

---

[1] The quoted transcript is taken from the court reporter's transcription of the interview being played aloud at the CrR 3.5 hearing. As the trial court judge did, the panel has reviewed the video and audio recording of the interview. We acknowledge the recording captures nuances in tone and pace a written transcript cannot. At the point at which the reporter transcribed "(cross talk)," Wilson seems to begin to say something before interrupting that statement to say that his name is Wendell. It appears to be in response to Detective Edwards' asking if he can call him Wendell. We observe that just before this, Detective Edwards asked two questions in immediate succession—whether Wilson had any questions, and whether the detective could call him Wendell. Throughout this exchange, Wilson is much more deliberate in his speaking than Detective Edwards' relatively more rapid pace.

MR. WILSON: Right.
DETECTIVE EDWARDS: Because I know, it was very hectic at the scene and I know it's very loud and everything going on. All right. So Wendell, at this time you have the right to remain silent. Anything you say can be used against you in a court of law. You have the right at this time to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements. So, do you understand each of these rights I've explained to you?
MR. WILSON: Yes, I do.
DETECTIVE EDWARDS: Okay. And then having these rights in mind, do you wish to talk to me now and give me your side of the story about what happened?
MR. WILSON: (Pause.) Yes.
DETECTIVE EDWARDS: You would like to talk to me now? Okay. Because—I mean, my job is to get both side—
MR. WILSON: I'm dead meat anyways.
DETECTIVE EDWARDS: I'm not going to say that.
MR. WILSON: Well, I'm saying it, so. . .

. . . .

DETECTIVE EDWARDS: Well, I mean that's—all my job is, is to put everything together—to then show somebody.
MR. WILSON: Right.
DETECTIVE JARED: We just want to get your side.
DETECTIVE EDWARDS: So you're willing to talk to us now?
MR. WILSON: Yeah.
DETECTIVE EDWARDS: Okay. All right. So can you tell me. . . kind of start the day. How did your day start there? What happened?"

(Emphasis added) (some alterations in original). Detective Edwards continued to interview Wilson for more than an hour.[2]

---

[2] The interview by Detective Edwards that was played at trial ended at approximately 7:10 p.m. Wilson remained in the interview room and the video continued until 10:35 p.m. The video shows that at 8:57 p.m. with a police officer in the room, Wilson asked, "At this point, can I still call for a, ask for a lawyer?" When the officer in the room deferred the question to other detectives, Wilson says again, "I'm just wondering how, when I might get one."

6

B

In the interview, Wilson stated he took hydrocodone twice on the day of the incident: once at 11:00 a.m. and again at 3:30 p.m. Wilson described the argument that concerned installing a baby gate in the kitchen, which eventually escalated with Lila Wilson threatening to move out. The argument took place throughout the apartment, and the two were in the master bedroom before Wilson retrieved the gun from the adjacent bedroom. Wilson stated the gun was in a closet up on a shelf in a gun case. The gun was already loaded, but Wilson did have to charge a round into the chamber. Lila Wilson never threatened him. Wilson stated he came out of the adjacent bedroom at the same time Lila Wilson came out of the master bedroom and the two were about a foot apart. When asked if he intended to shoot Lila Wilson when they met, Wilson said, "I said yes earlier and . . . no," but did say he intended to hurt her, though he further stated he intended to "more scare her." Detective Edwards asked Wilson what was his intention for using the gun, and Wilson stated, "It comes down to the dominance thing." Wilson explained it showed "who's got the power" and agreed with Detective Edwards that Wilson's use of the gun showed Lila Wilson that he had the last word. When Wilson shot Lila Wilson, she was well into the room because she started backing up, looked scared, and put her hands up in a defensive position. Wilson said when he went to get the gun, it was out of "rage," and fear never crossed his mind.

The State charged Wilson with first degree murder. In a pretrial CrR 3.5 hearing, Wilson argued his statements "I know I can't afford a lawyer" and "I'm going to have to ask for legal representation" were an unequivocal invocation of

his right to counsel. The State agreed Wilson "makes a statement," but argued Wilson then "also . . . continues to bring it out, then asks questions." The State argued Wilson's inquiry led the detective to have confusion so the detective "solves it in the way recommended by the case law," by repeating the <u>Miranda</u> warning. The trial court found "based on the entire context of this, that the statement that Mr. Wilson made concerning an attorney was an equivocal statement that required . . . Detective Edwards to seek clarification." The trial court relied on <u>State v. Pierce</u>, 169 Wn. App. 533, 544, 280 P.3d 1158 (2012) and cases discussed in <u>Pierce</u> that held statements such as " 'I'm going to need a lawyer' " were unequivocal invocations when they were made on their own and were not "followed by this question about the process." The trial court ruled Wilson did not unequivocally invoke his right to counsel and the interview statements were admissible. As CrR 3.5(c) requires, the court entered written findings of fact and conclusions of law.

The State played the interview at trial. Wilson presented expert testimony discussed more fully below that he lacked the capacity to form premeditated intent (which was necessary to convict him of first degree murder) or intent (which was necessary to convict him of second degree murder). Wilson's expert associated his opinion with Wilson's posttraumatic stress disorder from military service, among other diagnoses. The State called an expert witness in rebuttal who testified that Wilson's "behavior" suggested he had the ability "to form the requisite intent." The court instructed the jury on first degree murder and on the lesser included offenses of second degree murder, first degree manslaughter, and

second degree manslaughter. During deliberations, the jury asked for "more information about premeditation," what it meant to "have more than a moment in point of time," and "[h]ow short or long is it?" The jury asked for the DSM-5[3] criteria for posttraumatic stress disorder and for the experts' reports. The court referred the jury to the trial evidence and the instructions. The jury convicted Wilson of first degree murder.

C

Whether a defendant in a criminal case "unequivocally invoked" Miranda rights "is a mixed question of law and fact." In re Pers. Restraint of Cross, 180 Wn.2d 664, 680, 327 P.3d 660 (2014), abrogated on other grounds by State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018). Under this standard of review, "we defer to the trial court's findings of fact but review its legal conclusions from those findings de novo." Id. at 681 (citing State v. Broadaway, 133 Wn.2d 118, 131, 942 P.2d 363 (1997)). Wilson challenges the trial court's conclusion of law 2(f),

> The Defendant's discussion regarding getting a lawyer with Det[ective] Edwards at the police station before his interview was equivocal. The Defendant considered his options and waived his right to counsel. The Defendant's waiver of Miranda for the portion of the Detective's interview admitted and published to the jury was valid. Det[ective] Edwards sought proper clarification by reading Miranda and the Defendant's waiver of Miranda was proper.

Whether an invocation of Miranda rights is unambiguous is "a bright-line inquiry" and is an "objective" one. State v. Piatnitsky, 180 Wn.2d 407, 413, 325 P.3d 167 (2014). An invocation of Miranda rights "must be sufficiently clear 'that a

---

[3] AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013) (DSM-5).

reasonable police officer in the circumstances would understand the statement to be [an invocation of <u>Miranda</u> rights].' " <u>Piatnitsky</u>, 180 Wn.2d at 413 (alteration in original) (quoting <u>Davis v. United States</u>, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994)). The question is whether, "[a]s a matter of law," it was reasonable for the detectives to conclude that the right to counsel was not invoked. <u>Id.</u> The State agrees that this court therefore reviews de novo whether Wilson's invocation was sufficiently clear.

Before any custodial interrogation, "a suspect must be informed that ' . . . he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning.' " <u>Id.</u> at 412 (quoting <u>Miranda</u>, 384 U.S. at 479). "Once warnings have been given, the subsequent procedure is clear. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." <u>Miranda</u>, 384 U.S. at 473-474. The prohibition on further questioning "is not itself required by the Fifth Amendment's prohibition on coerced confessions," but is justified by its "prophylactic purpose" in safeguarding that Fifth Amendment right. <u>Connecticut v. Barrett</u>, 479 U.S. 523, 528, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987). Washington follows <u>Davis</u>'s standard for a suspect to clearly invoke <u>Miranda</u> rights. <u>State v. Radcliffe</u>, 164 Wn.2d 900, 907, 194 P.3d 250 (2008).

"[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." <u>Davis</u>, 512 U.S. at 458 (citing <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)). But

10

the suspect must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for counsel. Id. at 459. Invoking Miranda requires the expression of an objective intent to do so. Piatnitsky, 180 Wn.2d at 412.[4] As Davis summarized these principles, after a knowing and voluntary waiver of Miranda rights, law enforcement officers may continue questioning until and unless the suspect "clearly requests" an attorney. 512 U.S. at 461. If the suspect's statement is "not an unambiguous or unequivocal" request for counsel, the officers have no obligation to stop questioning him. Id. at 461-62.

Ambiguity in a request for counsel may exist in the circumstances leading up to the request or in nuances inherent in the request itself. Smith v. Illinois, 469 U.S. 91, 98-100, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984). But " '[i]nterpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous.' " State v. Nysta, 168 Wn. App. 30, 42, 275 P.3d 1162, 1169 (2012) (quoting Barrett, 479 U.S. at 529). " 'Using context to transform an unambiguous invocation into open-ended ambiguity defies both common sense and established Supreme Court law.' " Id. (internal quotation marks omitted) (quoting Anderson v. Terhune, 516 F.3d 781, 787 (9th Cir. 2008)). Where nothing about the request for counsel or the circumstances leading up to the request would

---

[4] Piatnitsky involved the right to remain silent, rather than the right to counsel, but Washington courts "draw no distinctions between the invocations of different Miranda rights" because " 'there is no principled reason to adopt different standards for determining when an accused has invoked the Miranda right to remain silent and the Miranda right to counsel.' " 180 Wn.2d at 413 (quoting Berghuis v. Thompkins, 560 U.S. 370, 381, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010)).

render it ambiguous, all questioning must cease. Id. Once a sufficiently clear invocation is made, "an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself."[5] Smith, 469 U.S. at 100.

In arguing the "language and circumstances" of Wilson's statement were "not unequivocal," the State emphasizes that Wilson's statement was one of inquiry. The State argues Wilson "ended his statement with a question about timing," suggesting he was "gathering information and assessing rather than

[5] For the first time on appeal, Wilson raises the possibility of a violation of CrR 3.1(c)(2), which requires that when a person in custody requests counsel, access to counsel by telephone or other means shall be provided "[a]t the earliest opportunity." Wilson refers to Detective Edwards's statement in answer to Wilson's inquiry about how long it would take to get a lawyer: "Well, you won't have one tonight." Wilson does not strictly argue the State violated CrR 3.1, but rather argues he invoked his right before this statement sufficiently clearly that questioning should already have ceased. Thus relying on invocation rather than a waiver argument, Wilson also does not argue that an otherwise valid Miranda waiver was vitiated because Detective Edwards's statement rendered the Miranda warnings unclear. Cf. State v. Mayer, 184 Wn.2d 548, 565, 362 P.3d 745 (2015) ("Of course, police officers may inform a suspect facing interrogation that appointed counsel is not immediately available. *But if they tell a suspect that appointed counsel is not available until a future point in time, they must also clarify that this does not affect the suspect's right to have counsel present during interrogation and his right to remain silent unless and until a lawyer can be present.*" (emphasis added)); deputy added to Miranda warning that no lawyer would be appointed unless defendant was arrested, jailed, and taken to court). We appreciate the State's admonition at oral argument that the record is silent concerning the availability of counsel that night, but we are skeptical that at 5:45 p.m. on a Monday night in June 2019 there would have been no means of connecting an indigent homicide suspect with a public defender in metropolitan King County. Wash. Ct. of Appeals oral argument, State v. Wilson, No. 84551-9-I (Apr. 23, 2024), at 18 min., 36 sec. to 19 min., 39 sec., https://tvw.org/video/division-1-court-of-appeals-2024041198/?eventID=2024041198; Cf. Pierce, 169 Wn. App. at 539 ("The jail procedure when a prisoner requests to speak to an attorney after normal business hours is for jail staff at the booking desk to dial the home phone numbers of the public defenders for the prisoner.").

making a plain assertion." The State likens the case to State v. Whitaker, in which the defendant asked during a custodial interrogation, " 'when he could talk to an attorney.' " 133 Wn. App. 199, 216, 135 P.3d 923 (2006). The questioning agents asked Whitaker whether he had an attorney or would need an appointed attorney, and Whitaker replied that he was talking about " 'when in the process an attorney would be appointed' for him." Id. We said Whitaker's question "might have been understood as an equivocal invocation of his right to counsel." Id. at 217. We confirmed this in Pierce, explaining "the Whitaker case presents an example of an equivocal request." 169 Wn. App. at 545. Whitaker stands for the proposition that a mere inquiry about the process of obtaining counsel, such as Wilson's question, "How long would it take me to get a lawyer?," is not an unequivocal request for counsel.

In contrast, we agree with the trial court's reading of Pierce, that a statement such as " 'I'm gonna need a lawyer' " unaccompanied by a context suggesting it is an inquiry about process clearly is an unequivocal request for counsel. 169 Wn. App. at 545-46. In Pierce, the State did not appear to contend otherwise. We focused on whether Pierce's statement could be viewed as equivocal because it was made as the apodosis of a conditional sentence. Id. at 546. Pierce's full statement was, " '*If* you're . . . trying to say I'm doing [sic] it I need a lawyer. I'm gonna need a lawyer because it wasn't me.' " Id. at 544 (emphasis added) (alterations in original). The court speculated it might have looked at the situation differently if the police had not yet accused Pierce of murder, but they had just

13

accused him when he said this so his statement was not truly conditional in context. Id. at 545-46.

Wilson's case falls between Whitaker and Pierce. As in Whitaker, Wilson posed a question about process by asking how long it would take to get a lawyer. But Wilson went clearly farther than the statements in Whitaker by stating he could not afford a lawyer, was going to have to ask for legal representation, and explaining that this was because if he answered questions without legal advice he was at risk of putting himself beyond a lawyer's help. Court have held statements such as these are a clear invocation of Miranda, both in Pierce, and in the authorities it discussed. In addition to Pierce's statement " 'I'm gonna need a lawyer,' " Nysta held it was an unequivocal invocation when a suspect said, " 'I gotta talk to my lawyer,' " 168 Wn. App. at 42, and People v. Cook held it was an unequivocal invocation when a suspect said, " 'Oh, I guess I am going to need an attorney,' " 665 P.2d 640, 643 (Colo. App. 1983). Contrary to the State's argument, none of these cases suggested there was ambiguity in these statements because the future tense "going to" might refer to some time later than the custodial interrogation. We agree with Wilson's observation at oral argument that he grounded his reasoning for asking for counsel in the interrogation by the detective that was immediately before him.[6]

---

[6] Wash. Court of Appeals oral argument, State v. Wilson, No. 84551-9-I (Apr. 23, 2024), at 11 min., 20 sec. to 11 min., 53 sec., https://tvw.org/video/division-1-court-of-appeals-2024041198/?eventID=2024041198

Wilson's statements are nevertheless a degree less clear than those in Pierce, because Wilson made them in a context building to an inquiry about process. The question is whether this makes a dispositive difference. We believe it does not. Another point Pierce makes clear is that a suspect's attitude of inquiry is not dispositive of whether a request for counsel is unequivocal. Beyond the ambiguous " 'maybe I should talk to a lawyer,' " statements of inquiry have been held ambiguous, such as the inquiry in Whitaker and the inquiry " 'I can't afford a lawyer but is there any way I can get one?' " Pierce, 169 Wn. App. at 546 (citing United States v. Lee, 413 F.3d 622, 625-26 (7th Cir. 2005)). But statements of inquiry have also been held to be unequivocal invocations, such as " 'I have to get me a good lawyer, man. Can I make a phone call?'; 'Can I talk to a lawyer? At this point, I think maybe you're looking at me as a suspect, and I should talk to a lawyer. Are you looking at me as a suspect?' "; and " 'Can I have a lawyer?' " Lee, 413 F.3d at 626 (quoting Lord v. Duckworth, 29 F.3d 1216, 1221 (7th Cir. 1994)). Wilson's statement is analogous to the unequivocal invocation " 'I have to get me a good lawyer, man. Can I make a phone call?' " Wilson builds to a question, including through the questioning body language noted by the trial court, but in doing so makes an unambiguous statement of having to ask for counsel.

Wilson's clear statement asking for counsel also was not confounded by his hesitancy about process. The State argues Wilson's statements showed equivocation because it appeared he was "mulling the situation over." The State likens this to Piatnitsky, in which Piatnitsky "expressed some hesitation about the questioning." 180 Wn.2d at 414. But nothing indicates Wilson was in a state of

15

mulling *about wanting a lawyer*. In Piatnitsky, detectives interviewed Piatnitsky about a shooting, and after about an hour of questioning during which he indicated he was willing to give a taped confession, the detectives turned on a tape recorder. 180 Wn.2d at 409. After a detective asked if he understood he had the right to remain silent, Piatnitsky said, "I'm not ready to do this, man" and "I don't want to talk right now, man." Id. at 410. The detectives advised him of his Miranda rights again and he signed a waiver form. Id. The Supreme Court held Piatnitsky understood he had a right to silence that he was not exercising. Id. at 414. But the whole record showed the his hesitation was only about making an audio-recorded statement. Id. The detectives "reasonably concluded that Piatnitsky's statements were a preference for a written statement over a recorded one." Id. at 414-15. Wilson was hesitant about whether he should speak to the detectives, and was hesitant about a process with which he was unfamiliar. But Wilson's statement about having to ask for counsel expressed no hesitation about a desire for proceeding with an attorney over proceeding without one.[7]

This brings Wilson's case much more in line with Nysta. We held questioning should have ceased during an interview with detectives when Nysta

---

[7] The State does not argue that Wilson's subsequent statement, after Detective Edwards continued questioning him and read the Miranda warnings again, that he was " 'dead meat anyway,' " bears on whether Wilson's original statement about having to ask for counsel was unequivocal. The State argues only that if Wilson's original statement was not unequivocal, then the court could look to Wilson's later statement to confirm his view that his guilt was, as the State argues, "so obvious that he need not summon a lawyer." This is a tacit admission that the only issue is whether Wilson's original statement was unequivocal. If it was, then detectives were required to cease questioning and our inquiry is at an end. Davis, 512 U.S. at 461. If it was not, then none of Wilson's statements amounted to an invocation of his Miranda rights.

16

said, "I gotta talk to my lawyer." 168 Wn. App. at 39-40. A detective continued questioning him, asking if he would be willing to take a polygraph and asking about a burglary law enforcement was investigating. Id. The State argued Nysta's statement about talking to a lawyer was equivocal because he really meant he wanted to consult with an attorney before deciding whether to take a polygraph, but was still willing to continue the interview without an attorney. Id. at 39-42. We rejected that reasoning, noting the State failed to cite authority that would support giving such an "elaborate contextual interpretation to words as plain as 'I gotta talk to my lawyer.'" Id. at 42. Here too, that Wilson wanted a lawyer was clear. This is not at odds with a simultaneous desire to cooperate indicated, the State argues, by Wilson's adding he was not asking for counsel "out of resistance." Contrary to the State's argument, Wilson's subsequent question was not directed to "when or how he might *need counsel* down the road." (Emphasis added.) Wilson directed his inquiry to when or how he might *get counsel* down the road. This does not contextualize away his clear request to have counsel.

The State also urges us to find context making Wilson's request for counsel ambiguous in the "circumstances leading up" to the interview, consisting chiefly of the statements Wilson had already made. Citing no authority, the State argues that Wilson's statement requesting counsel was equivocal because he told his ex-wife he had shot Lila Wilson, he said the same thing to the 911 operator, he said the same thing again to police at the scene, he appeared "calm, rational, articulate, and cordial" at the scene, and Detective Edwards "knew all this." The State appears to argue that a true request for counsel was by then unlikely, because

Wilson had said so much already. But this reasoning runs counter to <u>Nysta</u> for the same reasons discussed above, and counter to <u>Davis</u> itself. The point of the objective standard for invoking <u>Miranda</u> rights is to give law enforcement a bright line rule that can be applied without requiring questioning to cease merely if "a suspect makes a statement that *might* be a request for an attorney." <u>Davis</u>, 512 U.S. at 461. It is not enough to surmise from background circumstances that a suspect probably would want counsel, and by the same token surmise from circumstances that a suspect probably would not want counsel cannot defeat a clear statement that "I'm going to have to ask for legal representation."[8]

---

[8] Because we conclude Wilson's statement was an unequivocal invocation of his right to have counsel present, it follows that it was not a statement in need of clarification. <u>Nysta</u>, 168 Wn. App. at 39, 42 (declining to use context to interpret or clarify an unambiguous, plain language statement, " 'I gotta talk to my lawyer,' " that the defendant made to law enforcement). It is true that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." <u>Davis</u>, 512 U.S. at 461. We note, however, that the subsequent conversation that occurred in this case did not provide clarification equivalent to that shown in the decisions cited by the State. In <u>Piatnitsky</u>, when the defendant indicated he did not want to talk, the detectives clarified precisely, "So you'd rather take a written statement, do a written one," to which Piatnitsky answered, "Yes. I don't know (unintelligible)." 180 Wn.2d at 410. And in <u>Whitaker</u>, when the defendant asked about the process of obtaining counsel, the record showed "the agents also told Whitaker he could request an attorney 'at that moment' " and "clearly stated that if he asked for an attorney all questioning would stop." 133 Wn. App. at 216. We agree that if the detectives here had been faced with an ambiguous request for counsel and wished to clarify, it would have been appropriate to do so, but, especially coupled with the statement counsel was not available that night, they never provided Wilson the same clarity about his immediate right to counsel that the questioning agents did in <u>Whitaker</u>. Regardless, Wilson had made clear his request to have counsel.

Having reviewed de novo Wilson's statements, their context, and the video and audio recording of the interview, we conclude Wilson unequivocally invoked his right to counsel. The admission of the interview at trial was error.

II

An error in failing to suppress evidence obtained in violation of Miranda infringes the defendant's Fifth Amendment right against self-incrimination and is presumed prejudicial. State v. Spotted Elk, 109 Wn. App. 253, 261, 34 P.3d 906 (2001) (citing State v. Miller, 131 Wn.2d 78, 90, 929 P.2d 372 (1997)); State v. Easter, 130 Wn.2d 228, 242, 922 P.2d 1285 (1996); State v. Caldwell, 94 Wn.2d 614, 618, 618 P.2d 508 (1980)). " '[C]onstitutional error may be considered harmless if we are convinced beyond a reasonable doubt that any reasonable trier of fact would have reached the same result despite the error.' " State v. Scherf, 192 Wn.2d 350, 370, 429 P.3d 776 (2018) (alteration in original) (quoting State v. Thompson, 151 Wn.2d 793, 808, 92 P.3d 228 (2004)). To make this determination, the court uses the " 'overwhelming untainted evidence' " test. Id. The court considers the untainted evidence admitted at trial to determine if it is so overwhelming that it necessarily leads to a finding of guilt. Id. This requires that we review the balance of the trial evidence.

The State agrees the focus at trial was whether Wilson premeditated and intended murder, both of which were disputed. A person is guilty of first degree murder when with a premeditated intent to cause the death of another person, the person causes the death of such person. RCW 9A.32.030(1)(a). " 'Premeditation' involves a deliberate formation of and reflection on the intent to take a human life

19

and includes the mental process of thinking beforehand, deliberation, reflection, and weighing or reasoning for a period of time, however short." State v. Aguilar, 176 Wn. App. 264, 272-73, 308 P.3d 778 (2013). A wide range of proven facts will support an inference of premeditation. Id. at 273.

The State first points to what it calls "important admissions of guilt" by Wilson, starting with his statements at the scene. Firefighter and Emergency Medical Technician Justin Bodolay testified he examined Wilson at the scene on June 10, 2019. Bodolay testified Wilson was alert and oriented as to time, place, person, and event. In addition to Wilson's statements described above to Horton, the 911 operator, and officers at the scene, Officer Brett Willet took Wilson to a hospital after 10:00 p.m. on the night of the incident to have his blood drawn. At the hospital, Wilson said to the officer, " 'reality was starting to set in.' " About a year after the incident, Horton again spoke with Wilson over the phone while he was in jail. During the conversation, Horton asked Wilson if Lila Wilson threatening to leave with S. caused him to become so angry, and Wilson agreed. Further, Horton testified that Lila Wilson and Wilson were hot-tempered and would frequently get into verbal arguments, beginning when Lila Wilson first started living only with Wilson at around age 17. Lila Wilson later moved in with Wilson again, along with her husband and S. According to Horton, Wilson "fought depression," and S. made him a much happier person.

The State next points to statements Wilson made to the State's expert witness, Kenneth Muscatel, PhD. After Wilson called an expert witness who testified Wilson lacked the capacity to form intent or a premeditated intent, the

State called Dr. Muscatel as a rebuttal witness. Dr. Muscatel is a licensed clinical psychologist whose work includes forensic and neuropsychology. Dr. Muscatel has experience as an expert witness in posttraumatic stress, anger management, and completed evaluations for hundreds of homicide cases. Dr. Muscatel met with Wilson three times in person, the first time about two years after Wilson's arrest. Dr. Muscatel reviewed Wilson's medical records and Wilson's expert's assessment of those records.

Dr. Muscatel opined that Wilson had the capacity to form intent and felt Wilson's behavior and statements indicated that he would have had the time and ability to premeditate. Dr. Muscatel described his understanding of the day's events: an argument between Wilson and his daughter, the escalation when his daughter threatened to move out, potentially moving to Thailand with S. and her husband, Lila Wilson slamming the bedroom door in Wilson's face, Wilson going into the other bedroom, Wilson retrieving his gun from its case on a shelf, chambering a round, and returning to the bedroom where his daughter was, and shooting her repeatedly. Dr. Muscatel concluded Wilson was in a coherent state of mind during his 911 call and interviews; he did not appear mentally impaired or cloudy. Dr. Muscatel pointed to the following "series of activities" Wilson engaged in as evidence that his actions were borne out of anger, not fight or flight: after getting the door slammed in his face, Wilson went to another room in the apartment, retrieved the gun, and then came back with the gun. Dr. Muscatel said this sequence of events "does not suggest a simple act of impulsive rage" and

while impairments are "certainly present, they wouldn't reach the level that you could not form requisite intent."

The State further argues Wilson's statements in the interview would have been admissible to "impeach" Wilson's expert witness. Wilson called expert Robert Stanulis, PhD, a forensic psychologist and neuropsychologist. Dr. Stanulis has experience and training working with patients who had epilepsy seizures. Dr. Stanulis met with Wilson in September 2020, April 2021, and September 2021. The conversations in these interviews covered several topics, including Wilson's personal history, medical conditions, and the incident. Dr. Stanulis reviewed about 5,000 pages of medical records, police reports, interview transcripts, and Wilson's statements made to the police. Dr. Stanulis's report listed 44 different diagnoses. The State points to instances in which Dr. Stanulis indicated Wilson had difficulty recalling the events of the shooting, and argues that in response "the State would have been entitled to show that the defendant's detailed statements made immediately after the crime were more reliable than those made to a hired expert preparing for trial because such facts are relevant to his capacity."

As to Wilson's statements relied on by an expert witness, the State overlooks that such statements would not have been admissible as substantive evidence and would have been subject to an appropriate limiting instruction. State v. Caril, 23 Wn. App. 2d 416, 428, 515 P.3d 1036 (2022), review denied, 200 Wn.2d 1025, 522 P.3d 50 (2023), cert. denied, 144 S. Ct. 125, 217 L. Ed. 2d 39 (2023). An expert witness is permitted to base an opinion on facts or data that are not admissible in evidence if the facts or data are " 'of a type reasonably relied

upon by experts in the particular field in forming opinions or inferences upon the subject.' " Id. at 427 (quoting ER 703). An expert's testimony disclosing inadmissible facts or data to explain the expert's opinion is not proof of them as substantive evidence. Id. at 428. This rule would have limited the purposes for which the jury could have considered Wilson's statements to the extent Dr. Muscatel relayed them.

As to Dr. Stanulis's reports about Wilson's reported memory several months after the shooting, we are not convinced the State's authorities would have justified the wholesale playing of the interview as a response. In State v. DeGraw, the defendant called an expert witness who testified that at the time of a murder the defendant lacked recall of events and confirmed his belief based on the defendant's statements the defendant had had a "prolonged blackout." 196 W. Va. 261, 266, 470 S.E.2d 215 (1996). In rebuttal, the trial court permitted the State to introduce statements the defendant had made voluntarily, but before Miranda warnings, to the effect that the defendant acknowledged how police had learned of injuries he had received in the murder and acknowledged his flight from the state afterwards. Id. at 267 & n.8. On appeal, the court held that based on the defense expert testimony, the defendant's voluntary statements contradicting his representations to his expert could be offered solely for impeachment purposes either during the cross-examination of the expert or in rebuttal. Id. at 270.

DeGraw relied on Wilkes v. United States, where before being given Miranda warnings the defendant voluntarily told police where he had discarded the murder weapon and, albeit without ever saying what " 'it' " was, said three times

" 'I did it.' " 631 A.2d 880, 882 (D.C. 1993). At trial, the defendant called an expert witness who based his diminished capacity opinion in part on the defendant's statement to him that the defendant "lacked any memory of the events surrounding the charged offenses." Id. at 883. The appellate court affirmed admission of the defendant's statements to police, explaining, "We do not think that such a defendant should be allowed to lie to the psychiatrist and get away with it when there is evidence tending to show that he lied *and that the psychiatrist's diagnosis was based on that lie.*" Id. at 890 (alteration in original); cf. People v. Edwards, 11 Cal. App. 5th 759, 763, 217 Cal. Rptr. 3d 782 (2017) (defendant's statements to police and to defense expert were "inconsistent," raising concerns regarding "which version was valid").

The State does not point to any reversal by Wilson similar to those by the defendants in DeGraw and Wilkes. The State points merely to Dr. Stanulis's relaying that Wilson had some diminution in recall months later, but Wilson at no time denied all recall or claimed "blackout" after having made incriminating statements disproving such a claim as the defendants did in DeGraw and Wilkes. And the State emphasizes that its expert Dr. Muscatel in a similar interview was able (following the outline of the Detective Edwards interview) to walk through the same chronology of events with Wilson. Even if there were some particular statement relayed by Dr. Stanulis genuinely contradicted by a particular statement Wilson made to Detective Edwards—which the State has not shown—the State is far short of demonstrating that "[t]he truth-seeking process would be frustrated"

24

unless it were permitted to respond to Dr. Stanulis's testimony by playing the same nearly hour-long interview that it presented at trial. Wilkes, 631 A.2d at 889.

The State last argues that what it calls the "weakness" in Wilson's expert's opinions bears on the harmless error analysis. Dr. Stanulis testified Wilson lacked the capacity to form intent or a premeditated intent. Dr. Stanulis opined that Wilson suffered a seizure on June 10, 2019 and that Wilson suffers from Posttraumatic Stress Disorder (PTSD). Wilson took hydrocodone for the first time the day of the incident, which made it more likely to have a seizure or changes in the electrical activity of the brain. Bodolay at the scene observed dried blood around and inside of Wilson's mouth, though he did not have any concerns about the blood. Dr. Stanulis noted the blood found in Wilson's mouth and his possibly chewed tongue, saying this can be an indicator of seizures of which Wilson was not aware. Dr. Stanulis believed that Wilson then had postictal confusion impacting his capacity.

Dr. Stanulis testified that Wilson has complex PTSD due to enduring one trauma event after another, including abuse at an early age by his father, joining the military during the Vietnam War and experiencing combat-related trauma, and the deaths of his sister and one of his children in a motor vehicle collision. Dr. Stanulis noted Wilson's score of 7 out of 10 on an adverse childhood experience checklist was "a very, very high level." Dr. Stanulis described PTSD as influencing decision making through reactive instincts as opposed to rational thought. Dr. Stanulis opined that one can infer from Wilson's behavior on June 10, 2019 that he was showing symptoms of PTSD: he was feeling highly threatened and so he

25

responded the way he had rehearsed, with a gun for self-defense, which he learned from his time in the military.

Finally, Dr. Stanulis addressed Dr. Muscatel's report's reliance on "goal-oriented" behavior, such as "walking presumably from one room to the other into the bedroom to get the gun and coming back and discharging the gun." Dr. Stanulis testified this behavior did not constitute capacity and end the analysis, because "you can have goal-oriented behavior without thinking" and "goal-oriented doesn't equal intent in the law." Dr. Stanulis disagreed that one can infer the premeditated intent or intent just by looking at behavior. The parties thus presented conflicting expert testimony on Wilson's capacity, and it is clear from the jury's questions during deliberations asking for more information on premeditation and for copies of the experts' reports that the testimony was a focus for the jury. Dr. Stanulis's opinions were based on extensive review of Wilson's medical and social history, and were sufficiently robust to make the trial evidence less lopsided in the State's favor than the State portrays on appeal.

The untainted evidence that remains after excising the Detective Edwards's interview with Wilson is Horton's testimony about Wilson's phone calls with her, Wilson's 911 call, Wilson's statements at the scene, and, nonsubstantively, Wilson's statements to Dr. Stanulis and Dr. Muscatel. These sources reflect Wilson's statements to Horton that he was " 'going to kill Lila,' " " 'I killed Lila. I shot her,' " and Wilson's agreeing that Lila Wilson threatening to leave with S. is what caused him to become so angry; Wilson's statements to the 911 operator that he shot Lila Wilson because " 'we've been having a lot of arguments and today

26

it just finally got totally out of hand' "; Wilson's statements to Officer Sagiao that after they argued about putting up a baby gate, Lila Wilson said, "I'm leaving right now. I just want to go," she slammed her bedroom door in Wilson's face, he "went and got my gun, and I shot her," the gun was located in a closet "way up on the shelf" and not under a lock; and Officer Sagiao's testimony that he believed it was Lila Wilson's room where Wilson retrieved the gun and believed that he asked Wilson if he intended to kill Lila Wilson and believed Wilson said he did. What is less apparent from this evidence is over what period of time the argument and subsequent shooting occurred, where the argument took place in the apartment, where Wilson had to go to retrieve his gun, whether the gun was already loaded and charged, and Detective Edwards's discussion with Wilson about his rage over Lila Wilson's threatening to leave with S. and discussion of "dominance" and "power."

In arguing intent in closing, the State pointed to Wilson's scene statements but then argued that the "facts" corroborated those statements, pointing to the detailed chronology Detective Edwards established in the interview as confirmatory proof. In arguing premeditation, the State again relied on the same step-by-step narrative Detective Edwards elicited to argue Wilson's deliberate decisions. At oral argument, the State conceded the interview was its "best evidence" to support its theory that Wilson possessed the capacity to premeditate and intend to kill Lila Wilson.[9] We cannot say beyond a reasonable doubt the jury

---

[9] Wash. Court of Appeals oral argument, State v. Wilson, No. 84551-9-I (Apr. 23, 2024), at 27 min., 50 sec. to 28 min., 06 sec. and 28 min., 50 sec. to 29

would have reached the same verdict in the absence of the Detective Edwards interview admitted as substantive evidence.

We therefore reverse the judgment of conviction. In the event of retrial, the interview with Detective Edwards must be excluded as substantive evidence under Miranda. Our opinion does not foreclose its use for other proper purposes, including as the basis for expert opinion and impeachment, subject to appropriate limiting instructions. In light of our disposition, we do not reach Wilson's claim of error in his statement of additional grounds concerning an alleged violation of his right to a jury trial.

Reversed and remanded.

Birk, J.

WE CONCUR:

Coburn, J.                                Hazelrigg, A.C.J.

---

min., 59 sec., https://tvw.org/video/division-1-court-of-appeals-2024041198/?eventID=2024041198.