# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of: | No. 60435-3-II |
| JOHN PAUL BECKMEYER, | UNPUBLISHED OPINION |
| Petitioner. | |

MAXA, J. – In this personal restraint petition (PRP), John Beckmeyer seeks relief from personal restraint imposed following his 2021 convictions of second degree murder, two counts of second degree assault, and fourth degree assault. Beckmeyer's convictions arose from an incident in which he fired nine shots out of the window of his fifth wheel trailer. Two bullets struck and killed James McDonald, and other bullets impacted a motor home near where two women were sitting.

At trial, Beckmeyer argued that he was defending himself from McDonald, who was holding a shotgun at the time of the shooting. Beckmeyer argued that he fired toward McDonald because McDonald was approaching his window and pointing the shotgun at him. The State presented evidence that when Beckmeyer fired, McDonald's shotgun was in an "open" position and pointed toward the ground, and he was approximately 32 feet away from Beckmeyer.

The trial court gave a jury instruction regarding transferred intent with respect to the assault charges involving the two women. The court also instructed the jury that a person could not be held liable for unintentional harm caused to third parties while in the act of justifiable homicide. During closing arguments, the prosecutor argued that Beckmeyer was not telling the truth about the shooting and that his version of events was not supported by the evidence.

While incarcerated, Beckmeyer requested an extraordinary medical placement (EMP) under RCW 9.94A.728(1)(c) because of his health issues. The Department of Corrections (DOC) denied his request.

Regarding Beckmeyer's convictions, we hold that (1) the State presented sufficient evidence from which a reasonable jury could find that Beckmeyer's homicide was not justifiable; (2) the State presented sufficient evidence from which a reasonable jury could convict him of assault on the two women; (3) the trial court did not err in giving a transferred intent instruction, and Beckmeyer invited any error regarding the third party harm instruction because he proposed that instruction; (4) most of Beckmeyer's numerous prosecutorial misconduct challenges have no merit and he waived those challenges when he failed to object at trial; and (5) Beckmeyer did not receive ineffective assistance of trial or appellate counsel.

Regarding the denial of Beckmeyer's EMP, we hold that (1) DOC did not act arbitrarily and capriciously when it denied his EMP request, and (2) DOC did not violate Beckmeyer's due process rights when it denied his EMP request.

Accordingly, we deny Beckmeyer's PRP.

FACTS

*Background*

McDonald and his girlfriend Randi Benson lived in a house on a two acre property in Nordland, Washington. Beckmeyer and his girlfriend Danielle Boucher also lived on the

property in a fifth wheel trailer. There was a motor home approximately 38 feet from Beckmeyer's trailer. In between the trailer and motor home was a grassy area. Beckmeyer's trailer had a porch that extended roughly eight feet into this area. And there was a picnic table and chairs set up next to the motor home across from Beckmeyer's trailer.

On the day of the shooting, the couples were spending time in the picnic area together, drinking alcohol and preparing to barbeque. Boucher was playing music on a speaker. Beckmeyer asked her to turn the music down, and when she refused, he hit her on the side of her head. McDonald and Benson began yelling at Beckmeyer for hitting Boucher. Beckmeyer said that he was going to get a gun, and then went into his trailer. There was a window in the trailer overlooking the area between the motor home and trailer, including the picnic area.

After Beckmeyer left the area, McDonald went into his house and returned to the barbeque area with a break action double-barrel shotgun. A break action shotgun breaks open and is loaded from the middle of the shotgun. At some point after McDonald returned, Beckmeyer stuck his hand out of his bedroom window and fired several shots. Two shots struck McDonald. And several other shots struck the motor home. Benson and Boucher ducked to the ground during the shooting.

The State charged Beckmeyer with first degree murder and second degree murder of McDonald, two counts of first degree assault regarding Benson and Boucher, and fourth degree assault for hitting Boucher.

*Trial Testimony*

At trial, Benson testified that before Beckmeyer left for his trailer, he said he was going to get his gun. She said that Beckmeyer was angry and yelling when he said this.

Benson testified that McDonald went to get his shotgun after Beckmeyer left. She stated that McDonald then stood in between the picnic table, a lawnmower, and a minivan. Benson stated that McDonald was about 20 to 25 feet to her left. McDonald said that he was going to defend himself. Benson stated that while McDonald stood there, the shotgun was broken open. And she said that the shotgun was pointing at the ground. Benson testified that McDonald never pointed the shotgun at the trailer. And she denied ever yelling "No, James. No." before the shooting. Rep. of Proc. (RP) at 1243.

Benson stated that as McDonald was standing there, she saw a hand holding a black thing come out of the window of the trailer and heard gunshots. When she saw the black thing come out of the window, she and Boucher ducked toward the ground. She stated that they were taking cover on the ground in the picnic area next to the motor home. Benson said that after the shots were fired, she saw that McDonald had been shot twice.

Boucher testified that she was sitting on the picnic table before the shooting. She testified that she saw that McDonald's shotgun was broken open before the shooting. But she also stated that she saw McDonald point the shotgun at the trailer. Boucher said that she was within touching distance of McDonald before the shooting. Boucher said that when she was taking cover from the gunshots, she was in the picnic area. And she said that Benson was near the picnic table.

Forensic scientist Kim Duddy testified that she investigated the scene of the shooting. She stated that her investigation led her to conclude that nine total shots had been fired, seven of which hit the wall of the motor home and two of which hit McDonald. Duddy said that the bullet holes were horizontally oriented across the motor home. She also stated that blood stains on the bench seat in front of the motor home came from McDonald.

Duddy testified that officers recovered the shotgun in a broken open position. She stated that the shotgun had one shotgun shell in it. She recovered another shell next to McDonald. Duddy also said that when the shotgun was discovered, the muzzle end of the barrel was plugged with dirt and grass, and there was a divot in the ground next to where the barrels were.

Police Captain Benjaman Stamper testified that he recovered the .22 caliber handgun used in the shooting from next to Beckmeyer's bed. Beckmeyer told him he also had a .45 caliber handgun. Stamper also testified that when speaking with Beckmeyer at the scene, Beckmeyer told him that he shot McDonald because he was coming at him with a rifle. Stamper said that at some point Beckmeyer told him that he tried to shoot the ground, and at another point he said that he shot McDonald.

Detective Arthur Frank testified that he took measurements of the scene. Frank stated that there were 32 feet between the window from which Beckmeyer shot and the area near where McDonald's body was found.

The State introduced an interview with Beckmeyer that took place later in the day after the shooting. In this interview, Beckmeyer said that Benson and Boucher were yelling "no, no, no, and all this stuff" before he began shooting. RP at 1359. Beckmeyer also said that he did not know what happened to McDonald, and that he thought that McDonald had run away. But he said that he called 911 because he heard yelling and screaming. They discussed when Beckmeyer fell as the police arrested him, and Beckmeyer denied faking the fall. And in this recording, Beckmeyer denied hitting Boucher the day of the shooting.

Sheriff Sergeant Ryan Menday testified that he inspected the .22 handgun and double-barrel break-action shotgun recovered in this case. He testified that to load the shotgun that McDonald was holding, the barrel generally had to be pointed at a downward angle. If not, the

shotgun shell would slide out. And Menday testified that the shotgun could not be fired when the breach was open.

Beckmeyer's position at trial was that the homicide was justifiable because he acted in self-defense. Beckmeyer testified that after he hit Boucher, Benson yelled at him and he argued back with her. Beckmeyer said that McDonald began to attack him, but he was able to leave the area.

Beckmeyer stated that he left the picnic area, went to his trailer, and got into his bed. He said that he opened his blinds and saw McDonald standing outside his window. Beckmeyer said McDonald was pointing a gun at him. He knew McDonald owned multiple guns. But he did not know which one of those guns McDonald was holding at that time. He explained that this was because his window was dirty and he had poor eyesight.

Beckmeyer stated that McDonald was approaching the motor home and he heard Benson yelling "James, no. Don't. James, no. Don't." RP at 1457. And Beckmeyer said that McDonald got as close as eight feet away from the window, at the end of the porch. He said that at this point he grabbed his handgun and fired it out the window to scare McDonald away. Beckmeyer said that after the shooting, McDonald ran away from the area. Beckmeyer admitted to lying about hitting Boucher during his post shooting interview.

*Jury Instructions*

After the close of evidence, the State proposed a first aggressor instruction. The trial court declined to give one. In addition, the State proposed a transferred intent instruction. Beckmeyer opposed this instruction by arguing that it was not necessary. The court determined it would give transferred intent instruction. The instruction stated: "If a person acts with intent to

assault another, but the act harms a third person, the actor is also deemed to have acted with intent to assault the third person." Clerk's Papers (CP) at 338.

Beckmeyer requested a jury instruction that explained that if the jury found that the homicide was justifiable when he shot McDonald, he would not be liable for unintentional harm to Benson and Boucher. The court agreed to give this instruction, which stated,

> If a person harms a third party while in the act of justifiable homicide against another, he is excused from criminal liability for any unintentional harm caused to the third party. The State has the burden of proving beyond a reasonable doubt that the homicide was not justifiable.

CP at 339.

The trial court gave multiple instructions stating that the State had the burden of proving that Beckmeyer's act of shooting McDonald was not justifiable homicide. And the court gave instructions on the requisite intent to convict a person of assault.

*Closing Arguments*

During closing argument, the prosecutor argued that Beckmeyer escalated the incident and killed McDonald, who was holding an inoperable shotgun. The prosecutor explained that credibility was at issue in the case, and that the jury was the sole judge of the witnesses' credibility. The prosecutor then reviewed the instruction discussing what to consider when assessing a witness's credibility. During this argument, the prosecutor stated, "All the evidence for self defense comes from [Beckmeyer]. And if you don't find him credible, then there's no evidence at all to show that he was acting in self defense." CP at 2028.

When discussing Beckmeyer's credibility, the prosecutor stated that Beckmeyer lied to detectives at the scene by denying he hit Boucher. The prosecutor stated that Beckmeyer lied because of the inconsistencies between what he told the 911 operator and what he told

investigators during his post arrest interview.  The prosecutor also emphasized that the testimony and physical evidence contradicted Beckmeyer's version of events.

The prosecutor discussed the to convict instructions and offered argument as to why Beckmeyer acted with the intent to assault either McDonald or Benson.  And the prosecutor referenced the State's obligation to disprove justifiable homicide a total of five times during the argument.  However, at one point, the prosecutor said, "[m]aybe if he had only shot right at [McDonald] at point blank range . . . that might be -- he might be able to prove it then."  RP at 2046.  And the prosecutor stated, "[T]he mere fact that he's shooting over [Benson and Boucher's] heads is assault in the second degree because he's got the ability to harm them, and by firing he's shown that they should be afraid."  RP at 2052.

During rebuttal argument, the prosecutor argued that the pattern of bullets left on the motor home indicated that Beckmeyer was "tracking" McDonald.  RP at 2112-14.  The prosecutor also argued that even though a person may act on appearances when defending themselves, "you can't just make stuff up to make it appear like you're justified."  RP 2115-16.  Finally, the prosecutor concluded by saying that because Beckmeyer did not admit that he intentionally shot McDonald, the jury should not believe him.

During the prosecutor's closing arguments, Beckmeyer's counsel objected only once.  The objection argued that the prosecutor was referencing facts not in evidence with regard to what Beckmeyer said during an interview with law enforcement.  The trial court instructed the jury that the argument was not evidence.

*Verdict and Sentence*

The jury found Beckmeyer guilty of second degree murder, two counts of second degree assault, and fourth degree assault.  The trial court sentenced Beckmeyer to a total of 347 months

of confinement. On direct appeal, this court affirmed his convictions. *State v. Beckmeyer*, No. 56139-5-II (Wash. Ct. App. Aug. 22, 2023) (unpublished), http://www.courts.wa.gov/opinion/pdf/D2%2056139-5-II%20Unpublished%20Opinion.pdf.

*Beckmeyer's EMP Application*

In July 2024, Beckmeyer applied for an EMP because he had chronic pain and was confined to a wheelchair. A doctor from the facility he was incarcerated in completed a "physical incapacitation screening" form. Resp.'s Ex. 1, Attach. C at 6. Another doctor reviewed Beckmeyer's screening form and medical records, and concluded that he did not meet the medical eligibility requirements for an EMP. Then, DOC's chief medical officer, Dr. MaryAnn Curl reviewed Beckmeyer's screening form and his relevant medical records. Based on her review of the records, Dr. Curl concluded that Beckmeyer's medical condition was "not such that he no longer posed a threat to public safety and [was] unlikely to do so in the future." Resp.'s Ex. 3 at 3.

Dr. Curl stated that the DOC evaluates a patient's ability to perform activities of daily living (ADLs) as a way to evaluate objectively the extent to which patients are impacted by their medical conditions. And she stated that this is a common practice for health care providers.

DOC notified Beckmeyer that he was not eligible for EMP but could reapply if his medical conditions changed. In response to an inquiry from Beckmeyer's counsel, DOC stated that Beckmeyer did not demonstrate dependencies and "[i]n order to be medically eligible for EMP consideration, a person must demonstrate dependence in activities of daily living." PRP, Ex. 5 at 3 . And DOC told Beckmeyer's counsel that "The law stipulates debilitation such that the risk is lessened by the illness. In the case of Mr. Beckmeyer, his level of debilitation does not meet the bar." PRP, Ex. 5 at 1.

9

DOC officials also explained that although its written policies regarding the EMP review process recently had changed, DOC updated its policies when RCW 9.94A.728(1)(c) was amended in 2023.

Beckmeyer filed this timely PRP.

ANALYSIS

A.    PRP PRINCIPLES

To prevail in a PRP, the petitioner must establish by a preponderance of the evidence (1) a constitutional error that resulted in actual and substantial prejudice or (2) a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice. *In re Pers. Restraint of Meredith*, 191 Wn.2d 300, 306, 422 P.3d 458 (2018). Establishing "actual and substantial prejudice" means more than showing a possibility of prejudice; the petitioner must establish that if the alleged error had not occurred, the outcome more likely than not would have been different. *In re Pers. Restraint of Meippen*, 193 Wn.2d 310, 315-16, 440 P3d 978 (2019).

B.    SUFFICIENCY OF THE EVIDENCE

Beckmeyer argues that the State failed to present sufficient evidence to (1) prove beyond a reasonable doubt that the homicide was not justified, and (2) prove beyond a reasonable doubt that he acted with the intent required to convict him of second degree assault of Benson and Boucher. We disagree.

1.    Standard of Review

When evaluating the sufficiency of evidence for a conviction, we view the evidence in the light most favorable to the State and ask whether a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *State v. Bergstrom*, 199 Wn.2d 23, 40-41, 502 P.3d 837 (2022). We assume the truth of the State's evidence and all reasonable inferences that may be drawn therefrom. *Id*. at 41. These inferences must be construed in the State's favor and

strongly against the defendant. *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019). And we defer to the trier of fact's resolution of conflicting testimony, witness credibility, and the persuasiveness of the evidence. *Bergstrom*, 199 Wn.2d at 41.

2. Disproof of Justifiable Homicide

Beckmeyer argues that the State failed to present sufficient evidence to prove beyond a reasonable doubt that the homicide was not justified. We disagree.

a. Legal Principles

Beckmeyer asserted a defense of justifiable homicide. RCW 9A.16.050(1) states that a homicide is justifiable if,

> In the lawful defense of the slayer, . . . when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great personal injury to the slayer . . . , and there is imminent danger of such design being accomplished.

In addition, RCW 9A.16.020, the general self-defense statute, states,

> The use, attempt, or offer to use force upon or toward the person of another is not unlawful in the following cases:
> . . . .
>
> (3) Whenever used by a party about to be injured, . . . in preventing or attempting to prevent an offense against his or her person, . . . in case the force is not more than is necessary.

"Necessary" is defined to mean "that no reasonably effective alternative to the use of force appeared to exist and that the amount of force used was reasonable to effect the lawful purpose intended." RCW 9A.16.010(1).

"A defendant is entitled to an instruction on justifiable homicide when he or she has raised some credible evidence, from whatever source, to establish that the killing occurred in circumstances that meet the requirements of RCW 9A.16.050." *State v. Brightman*, 155 Wn.2d

11

506, 520, 122 P.3d 150 (2005).  And the State must prove the absence of justifiable homicide beyond a reasonable doubt.  *Id.*

Consistent with these statutes, the trial court gave the following instruction on justifiable homicide:

Homicide is justifiable when committed in the lawful defense of the slayer when:

(1) the slayer reasonably believed that the person slain intended to inflict death or great personal injury;

(2) the slayer reasonably believed that there was imminent danger of such harm being accomplished; and

(3) the slayer employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to him at the time of and prior to the incident.

The State has the burden of proving beyond a reasonable doubt that the homicide was not justifiable.  If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

CP at 333.  This instruction was based on 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.02 (5th ed. 2024).

> b.  Analysis

Beckmeyer testified that he feared for his safety and began shooting because McDonald approached his window to within eight feet, pointed the shotgun at him, and heard Benson yelling, "No, James. Don't."  RP at 1456-59.  However, we must view the evidence in the light most favorable to the State.  *Bergstrom*, 199 Wn.2d at 40-41.

The State presented testimony from Boucher and Benson that before the shooting McDonald was standing near the picnic area.  This area was far from where Beckmeyer claimed

McDonald was standing when Beckmeyer started shooting. And McDonald's blood was found on and around the picnic table, not near Beckmeyer's trailer. There was evidence that McDonald was approximately 32 feet from the trailer when he was shot.

In addition, Benson testified that McDonald never pointed the shotgun at Beckmeyer. And she stated that McDonald was pointing the shotgun at the ground before the shooting. Both Benson and Boucher testified that they saw that the shotgun was in a broken open condition when the shooting began. Forensic scientist Duddy testified that the shotgun was recovered in the broken open position. And Sergeant Menday stated that had the shotgun been pointed at an upwards angle in the broken open position, the shells would have fallen out. But the shotgun had one shell in it when it was recovered. Finally, Benson testified that she never yelled "No, James. No." before to the shooting. RP at 1243.

Given these facts, a rational jury could have concluded that Beckmeyer did not reasonably believe that McDonald intended to inflect death or great personal injury on him and/or did not reasonably believe that there was imminent danger of such harm being accomplished. And a rational jury could have concluded that Beckmeyer used greater force than necessary under the circumstances. Accordingly, we hold that there was sufficient evidence from which the jury could conclude that Beckmeyer did not engage in justifiable homicide.

3. Second Degree Assault

Beckmeyer argues that the State failed to present sufficient evidence to prove beyond a reasonable doubt that he acted with the intent required to convict him of second degree assault of Benson and Boucher. We disagree.

a. Legal Principles

A person commits second degree assault when they "[a]ssault[] another with a deadly weapon." RCW 9A.36.021(1)(c). The statute does not define assault, so we use the common law definition. *State v. Byrd*, 125 Wn.2d 707, 712, 887 P.2d 396 (1995). Washington recognizes two common law definitions of assault in addition to actual battery: "first, an attempt to cause bodily injury by unlawful force, and second, an attempt to cause fear and apprehension of such an injury." *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 724-25 543 P.3d 821 (2024). A required element for second degree assault is the " 'specific intent either to create apprehension of bodily harm or to cause bodily harm.' " *State v. Abuan*, 161 Wn. App. 135, 154-55, 257 P.3d 1 (2011) (quoting *Byrd*, 125 Wn.2d at 713). But a jury may infer specific intent from conduct when that conduct plainly indicates such an intent. *Arntsen*, 2 Wn.3d at 729.

Consistent with this law, the trial court gave the following instruction on assault:

An assault is also an act, with unlawful force, done with intent to inflict bodily injury upon another, tending but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted.

An assault is also an act, with unlawful force, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

CP at 340.

The doctrine of transferred intent applies in second degree assault cases when an accidental or unintended victim is involved. *State v. Cortes Aguilar*, 176 Wn. App 264, 275, 308 P.3d 778 (2013). Under the doctrine of transferred intent, if the State can establish the defendant's intent to assault an intended victim, that intent "transfers to any other victim who is actually assaulted." *Id.*

14

b.     Challenged Jury Instructions

Initially, Beckmeyer argues that the trial court erred in giving two assault instructions: instruction 21 and instruction 22.  We disagree.

We review jury instructions de novo, and in the context of all of the instructions to the jury.  *State v. Marchi*, 158 Wn. App 823, 834, 243 P.3d 556 (2010).  Jury instructions are proper if they allow the parties to argue their theories of the case and correctly state the law.  *State v. Hribar*, 34 Wn. App. 2d 546, 553, 569 P.3d 743, *review denied*, 5 Wn.3d 1014 (2025).  An instruction that misstates the law is erroneous.  *State v. Clausing*, 147 Wn.2d 620, 628, 56 P.3d 550 (2002).

Jury instruction 21 stated, "If a person acts with intent to assault another, but the act harms a third person, the actor is also deemed to have acted with intent to assault the third person."  CP at 338.  Beckmeyer argues that this instruction was erroneous because the State claimed that Beckmeyer intended to kill McDonald, not assault him, and the intent to kill cannot transform into an intent to assault.  Beckmeyer also argues that once he accomplished his intent to kill McDonald, there was no intent to transfer.

However, the fact that Beckmeyer intended to kill McDonald does not exclude the fact that he also intended to assault him.  Beckmeyer clearly attempted "to cause bodily injury by unlawful force."  *Arntsen*, 2 Wn.3d at 724.  And while two shots hit McDonald, seven shots did not.  The evidence was sufficient to support a finding that Beckmeyer had the intent to assault McDonald.  And instruction 21 did not misstate the law of transferred intent.  *Cortes Aguilar*, 176 Wn. App. at 275.  Accordingly, we hold that the trial court did not err in giving instruction 21.

Jury instruction 22 stated, "If a person harms a third party while in the act of justifiable homicide against another, he is excused from criminal liability for any unintentional harm caused to the third party. The State has the burden of proving beyond a reasonable doubt that the homicide was not justifiable." CP at 339. Beckmeyer argues that the trial court erred in giving this instruction.

However, Beckmeyer proposed instruction number 22. Under the invited error doctrine, a party is prohibited from contributing to an error at trial and then complaining of it on appeal. *In re Pers. Restraint of Coggin*, 182 Wn.2d 115, 124, 340 P.3d 810 (2014). Relevant here, a defendant is precluded from challenging a jury instruction on appeal when the defendant proposed that instruction. *State v. Weaver*, 198 Wn.2d 459, 465, 496 P.3d 1183 (2021). Because Beckmeyer proposed instruction number 22, he cannot now challenge that instruction. Accordingly, we hold that Beckmeyer's challenge to instruction 22 fails.

c. Sufficiency Analysis

Under instruction 21, the State had to prove that Beckmeyer acted with intent to inflict bodily injury on or create a reasonable apprehension and fear of bodily injury in McDonald. If the State could establish this requisite intent as to McDonald, that intent could transfer to Benson and Boucher if they also were harmed.

As stated above, the evidence supports a finding that Beckmeyer intended to assault McDonald. He fired nine shots at McDonald, and the seven shots that missed hit the motor home in a horizontal pattern. A rational jury could find that Beckmeyer intended to inflict bodily injury on or create a reasonable apprehension and fear of bodily injury in McDonald.

And the evidence supports a finding that Benson and Boucher were harmed. The bullets hit the motor home directly above where Benson and Boucher ducked for cover in the picnic

16

area.  Both Benson and Boucher testified that they were standing close to McDonald when he was shot.  A rational jury could find that both Benson and Boucher experienced a reasonable apprehension and fear of bodily injury.

Accordingly, we hold that the State presented sufficient evidence from which a jury could conclude that Beckmeyer committed second degree assault of Benson and Boucher.

C.    PROSECUTORIAL MISCONDUCT

Beckmeyer argues that the prosecutor committed misconduct during closing argument in multiple ways.  We conclude that the prosecutors' comments do not constitute misconduct, or Beckmeyer waived his prosecutorial misconduct claim because he failed to object.

1.    Legal Principles

To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial.  *State v. Loughbom*, 196 Wn.2d 64, 70, 470 P.3d 499 (2020).  We consider a prosecutor's conduct based on "the context of the case, the arguments as a whole, the evidence presented, and the jury instructions."  *State v. Slater*, 197 Wn.2d 660, 681, 486 P.3d 873 (2021).  To show prejudice, the defendant is required to show a substantial likelihood that the misconduct affected the jury trial.  *Id.*

Prosecutors have "wide latitude" to assert reasonable inferences from the evidence.  *Id.* at 680.  This includes arguments regarding the credibility of witnesses.  *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011).  However, it is improper for the prosecutor to misstate the evidence presented at trial and thereby mislead the jury.  *State v. Meza*, 26 Wn. App. 2d 604, 619, 529 P.3d 398 (2023).  Further, arguments that misstate the law constitute prosecutorial misconduct.  *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). And it is misconduct for a

prosecutor to shift the burden of proof to the defendant. *State v. Stotts*, 26 Wn. App. 2d 154, 170, 527 P.3d 842 (2023).

A prosecutor who states a personal opinion as to the credibility of witnesses or the defendant's guilt commits misconduct. *State v. Lindsay*, 180 Wn.2d 423, 437, 326 P.3d 125 (2014). But a prosecutor can argue about the credibility of witnesses if based on reasonable inferences from the evidence. *Thorgerson,* 172 Wn.2d at 448. Specifically, a prosecutor may argue that the defendant is not telling the truth if the prosecutor refers to specific evidence that supports an argument that the defendant lied. *State v. McKenzie*, 157 Wn.2d 44, 59, 134 P.3d 221 (2006); *State v. Copeland*, 130 Wn.2d 244, 291-92, 922 P.2d 1304 (1996). And we will only find a prosecutor has committed misconduct by expressing a personal opinion where it is clear that they are expressing an opinion, rather than arguing an inference from the evidence. *McKenzie*, 157 Wn.2d at 54.

When the defendant fails to object at trial, a heightened standard of review requires the defendant to show that the conduct was " 'so flagrant and ill intentioned that [a jury] instruction would not have cured the [resulting] prejudice.' " *State v. Zamora*, 199 Wn.2d 698, 709, 512 P.3d 512 (2022) (alterations in original) (quoting *Loughbom*, 196 Wn.2d at 70). "In other words, the defendant who did not object must show the improper conduct resulted in *incurable* prejudice." *Zamora*, 199 Wn.2d at 709. If a defendant fails to make this showing, the prosecutorial misconduct claim is waived. *Slater*, 197 Wn.2d at 681.

Courts have found flagrant and ill-intentioned conduct in a "narrow set of cases," including "where the prosecutor otherwise comments on the evidence in an inflammatory manner." *In re Pers. Restraint of Phelps*, 190 Wn.2d 155, 170, 410 P.3d 1142 (2018). And it is less likely that improper statements will cause incurable prejudice when they do not have an

inflammatory effect. *See State v. Emery*, 174 Wn.2d 741, 762-63, 278 P.3d 653 (2012). The defendant "must show that the prejudice was so inflammatory that it could not have been defused by an instruction." *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003).

2.   Analysis

Beckmeyer presents three separate charts identifying a total of 53 statements during the prosecutor's closing argument that he claims constitute misconduct. We have reviewed the 17 challenged statements in the chart titled "Mischaracterizations of the Evidence," PRP at 32-36, the 11 challenged statements in the chart titled "Misstatements of the Law," PRP at 38-40, and the 25 challenged statements in the chart titled "Other Improper Argument," PRP at 43-47.

We conclude that most of these statements were not improper. And even if they were, Beckmeyer did not object to any of these statements. We conclude that the prosecutor's statements were not so flagrant and ill-intentioned or not so inflammatory that a jury instruction could not have cured any prejudice. Therefore, Beckmeyer waived these challenges.

We specifically will address certain statements that Beckmeyer emphasizes. First, Beckmeyer argues that the prosecutor misstated the law by claiming that the victim – McDonald – was acting in self-defense. He relies on the trial court's ruling that the State was not entitled to a first aggressor instruction. But the evidence showed that Beckmeyer said that he was going to get a gun, and McDonald said that he retrieved his shotgun to defend himself. The prosecutor was arguing those facts, and he did not make a legal argument that Beckmeyer was the first aggressor or that McDonald would have been entitled to a self-defense instruction.

Second, Beckmeyer argues that the prosecutor misstated the evidence and the law by stating that "[a]ll the evidence for self defense comes from [Beckmeyer]. And if you don't find him credible, then there's no evidence at all to show that he was acting in self defense." RP at

2028. Beckmeyer argues that this statement discounted the fact that Benson and Boucher also testified about the incident and incorrectly implied that whether there was unlawful force must be determined based only on his testimony. However, given the prosecutor's wide latitude to assert reasonable inferences from the record, the prosecutor was free to argue that the only *relevant* evidence regarding unlawful force came from Beckmeyer and the other evidence did not support his theory. And this argument accurately pointed out that Beckmeyer's credibility was at issue.

Third, Beckmeyer argues that the prosecutor committed misconduct by repeatedly stating that he had lied. However, these arguments were supported by reference to specific evidence that supported that characterization, including Beckmeyer's admission that he lied about hitting Boucher; gave inconsistent statements regarding what he saw; and staged a fall during his initial arrest. Read in context, the prosecutors were arguing inferences from the evidence instead of giving personal opinions regarding his credibility. *See McKenzie*, 157 Wn.2d at 54.

Fourth, Beckmeyer argues that the prosecutor committed misconduct by arguing, "The jury's job is to look at what [Beckmeyer's] claiming and say is that really reasonable." RP at 2116. Beckmeyer claims that this statement improperly told the jury that its function was to determine whether he was lying rather than determining whether the State met its burden of proof. But this statement merely highlighted that Beckmeyer's credibility was at issue, which the prosecutor is allowed to argue. *See Thorgerson,* 172 Wn.2d at 448.

Fifth, Beckmeyer argues that the prosecutor shifted the burden of proof by arguing, "Maybe if [Beckmeyer] had only shot right at [McDonald] at point blank range or something like that, that might be -- [Beckmeyer] might be able to prove [justifiable homicide] then." RP at 2046. We agree that this statement was improper because it implied that Beckmeyer had the obligation to prove justifiable homicide. However, if Beckmeyer had objected, any prejudice

20

could have been cured by an instruction reminding the jury that the State had the burden of disproving justifiable homicide. Therefore, we conclude that Beckmeyer waived his challenge to this statement.

Sixth, Beckmeyer argues that the prosecutor misstated the law by arguing that "the mere fact that [Beckmeyer is] shooting over [Benson's and Boucher's] heads is assault in the second degree." RP at 2052. We agree that this statement was improper because it ignored the State's burden to prove that he had the intent to assault Benson and Boucher. However, if Beckmeyer had objected, any prejudice could have been cured by an instruction reminding the jury to review the assault instruction requiring intent and the transferred intent instruction. Therefore, we conclude that Beckmeyer waived his challenge to this statement.

Accordingly, we conclude that Beckmeyer's prosecutorial misconduct claims fail.

D.     INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Beckmeyer argues that he received ineffective assistance of counsel when his defense counsel (1) failed to object to inappropriate statements made by the prosecutor during closing argument; and (2) proposed jury instruction 22. We disagree.

1.     Legal Principles

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to effective assistance of counsel. *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024). A defendant asserting that they received ineffective assistance of counsel must show both that counsel's representation was deficient and that the deficient representation prejudiced the defendant. *Id*.

Defense counsel's representation is deficient if after considering all the circumstances, the performance falls below an objective standard of reasonableness. *State v. Vasquez*, 198

Wn.2d 239, 247-48, 494 P.3d 424 (2021). There is a strong presumption that defense counsel's performance was reasonable. *Bertrand*, 3 Wn.3d at 128. To rebut that presumption, a defendant bears the burden of establishing the absence of any legitimate strategic or tactical reason explaining counsel's conduct. *Vazquez*, 198 Wn.2d at 248. Prejudice exists if there is a reasonable probability that the result of the trial would have been different but for defense counsel's deficient performance. *Bertrand*, 3 Wn.3d at 129.

Whether and when to object typically is a strategic or tactical decision. *Vasquez*, 198 Wn.2d at 248. To establish deficient performance based on a failure to object, a defendant must show that the trial court would have sustained the objection. *Id.*

2. Analysis

As discussed above, we have concluded that almost all of the statements Beckmeyer challenges were not improper. Therefore, he cannot show that the trial court would have sustained objections to those comments.

Regarding the statement implying that Beckmeyer had the burden of proving justifiable homicide, defense counsel arguably was deficient in failing to object. However, this statement was made in passing as part of a hypothetical that the evidence did not support. And the prosecutor repeatedly emphasized during closing argument that the State had to disprove self-defense. And the jury instructions properly instructed the jury regarding this burden of proof as well as the required elements of second degree assault. We presume the jury followed these instructions. *Weaver*, 198 Wn.2d at 467. Therefore, we conclude that Beckmeyer has failed to show the result would have been different had his defense counsel objected to this statement.

Regarding the statement that merely shooting over the heads of Benson and Boucher constituted an assault, defense counsel arguably was deficient in failing to object. But again, this

statement was made in passing. The prosecutor did not argue that the State was not required to prove intent, and the trial court instructed the jury that assault required intent and on transferred intent. We presume the jury followed these instructions. *Id.* Therefore, we conclude that Beckmeyer has failed to show the result would have been different had his defense counsel objected to this statement.

Regarding defense counsel's proposal of instruction 22, Beckmeyer argues that defense counsel should not have proposed this instruction because it permitted the jury to convict him for assault without proving the other elements of assault. But the instruction was an accurate statement of the law. *See* RCW 9A.16.110(1) ("No person in the state shall be placed in legal jeopardy of any kind whatsoever for protecting by any reasonable means necessary, himself . . . who is in imminent danger of or the victim of assault . . . [or] murder."). And defense counsel had a conceivable tactical reason for proposing this instruction – to avoid felony assault convictions if Beckmeyer was acquitted on the murder charge. Therefore, we conclude that defense counsel was not deficient in proposing instruction 22.

E.    INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Beckmeyer argues that he received ineffective assistance of counsel because his appellate counsel failed to raise on appeal the prosecutorial misconduct and instructional errors raised in this PRP. As discussed above, we hold that none of those claims have merit. Therefore, we reject Beckmeyer's ineffective assistance of appellate counsel claim.

F.    EXTRAORDINARY MEDICAL PLACEMENT REQUEST

Beckmeyer argues that he is unlawfully confined because DOC violated the EMP statute when it denied his EMP request and because this denial violated his due process rights. We disagree.

23

1.    Standard of Review

Where a petitioner has not had the opportunity to seek direct judicial review of a claimed

error, we do not apply the heightened threshold requirements that ordinarily apply to a PRP.  *In*

*re Pers. Restraint of Becker*, 25 Wn. App. 2d 625, 628, 524 P.3d 715 (2023).  Instead, the

petitioner must show only that they are under unlawful restraint under RAP 16.4(b).  *Id*.

Release to community custody is a condition or manner of the restraint under RAP

16.4(c)(6).  Beckmeyer has not yet had the opportunity to seek direct judicial review of his

claimed errors regarding EMP placement.  Therefore, to obtain relief Beckmeyer must show that

DOC's denial of his EMP application violated the United States Constitution, Washington

Constitution, or Washington law.  RAP 16.4(c)(6); *Becker*, 25 Wn. App. 2d at 628.

2.    Legal Background

RCW 9.94A.728(1)(c) states,

(i)  The secretary [of DOC] may authorize an extraordinary medical placement for
an incarcerated individual when all of the following conditions exist:

(A) The incarcerated individual has been assessed by two physicians and is
determined to be one of the following:

(I)  Affected by a permanent or degenerative medical condition to such a degree
that the individual does not presently, and likely will not in the future, pose a
threat to public safety; or
. . . .

(B)  The incarcerated individual has been assessed as low risk to the community at
the time of release; and

(C)  It is expected that granting the extraordinary medical placement will result in
a cost savings to the state.

In addition, DOC may revoke EMP at any time.  RCW 9.94A.728(1)(c)(iv).

A previous version of RCW 9.94A.728(1)(c) did not include the requirement that two

physicians assess the incarcerated person.  Former RCW 9.94A.728(1)(c) (2021).  And it stated

24

that an incarcerated individual could be granted EMP if they posed "a low risk to the community because he or she is currently physically incapacitated due to age or the medical condition." Former RCW 9.94A.728(1)(c)(i)(B).

### 3.    Denial of EMP

Beckmeyer claims that DOC applied an outdated statutory standard when it denied his EMP application. We disagree.

We review decisions made by the DOC regarding prison administration under the arbitrary and capricious standard. *See In re Pers. Restraint of Dyer*, 143 Wn.2d 384, 391, 20 P.3d 907 (2001) (considering denial of visitation rights); *Becker*, 25 Wn. App. 2d at 628 (considering DOC policy). An agency's decision "is arbitrary and capricious only if it is willful and unreasoning action in disregard of facts or circumstances." *Dyer*, 143 Wn.2d at 395 (internal quotations marks omitted). For example, the court in *Becker* held that a DOC policy of prohibiting certain sex offenders from participating in a sexual offender treatment program was arbitrary and capricious. 25 Wn. App. 2d at 629-30.

Here, two physicians assessed Beckmeyer's medical records and EMP application. They both considered whether he was affected by his medical conditions to such a degree that he did not pose a threat to the public. Both concluded that he did not meet the medical requirements for release. And Dr. Curl stated that after she assessed Beckmeyer's materials and application, she concluded that he was not so affected by his medical condition that he no longer posed a risk to the public. This was a legitimate reason for denial.[1]

---

[1] Beckmeyer also contends, in passing, that he was not "assessed" by two physicians because it appears that they did not physically examine him. But he fails to provide any argument as to why the term assessment in the statute requires a physical examination. We therefore decline to address this argument. *Cook v. Brateng*, 158 Wn. App. 777, 794, 262 P.3d 1228 (2010).

As a means of determining whether he was so affected by his medical conditions that he was not a threat to the public, the physicians considered whether he was able to perform ADLs and stated that he did not qualify because he had no dependencies.

Beckmeyer contends that by considering ADLs, DOC held his petition to the standard required by former RCW 9.94A.728(1)(c)(i)(B), which permitted release only if the incarcerated individual is "currently physically incapacitated due to age or the medical condition." But he has failed to show that by considering ADLs, or requiring some degree of dependence in daily life, the physicians required *complete physical incapacitation* in order for him to qualify for release. Instead, DOC used ADLs as a means of assessing whether he was a threat to public safety. Considering the degree to which someone can operate in the community independently is a reasonable, and objective method of determining whether an individual is so affected by a medical condition that they do not pose a threat to the community.

In addition, unlike the arbitrary and capricious policy in *Becker*, this process is congruent with the policy of the statute, which requires two physicians to conclude that the incarcerated person is not a threat to the community before they are conditionally released. RCW 9.94A.728(1)(c)(i)(A)(1). Therefore, we conclude that DOC did not act arbitrarily and capriciously in denying Beckmeyer's EMP application.

Accordingly, we hold Beckmeyer has failed to show that DOC failed to follow the statutory requirements regarding determination of medical conditions and risks.

4. Due Process Claim

Beckmeyer argues that DOC violated his due process rights when his EMP application was denied. We disagree.

The Fifth and Fourteenth Amendments to the United States Constitution and article I, section 3 of the Washington Constitution state that no person shall be deprived of life, liberty, or property without due process of law. Due process requirements are only implicated when the interest implicated is a life, liberty, or property interest. *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005).

Incarcerated people do not have an inherent or constitutional right to conditional release before the expiration of their sentence. *In re Pers. Restraint of Mattson*, 166 Wn.2d 730, 738, 214 P.3d 141 (2009). Statutes may create a protectable liberty interest when they prescribe a given outcome for a specific set of facts. *Id*. But statutes that grant a significant degree of discretion do not create a protectable liberty interest. *Id*. In addition, procedural laws that "establish only the procedures for official decisionmaking" cannot create liberty interests. *In re Pers. Restraint of Cashaw*, 123 Wn.2d 138, 145, 866 P.2d 8 (1994).

The Supreme Court has held that the prior version of RCW 9.94A.728(1)(c) does not create a due process liberty interest in early release to community custody. *Mattson*, 166 Wn.2d at 740. Like the version of statute considered in *Mattson*, the current version of RCW 9.94A.728(1)(c) grants a significant degree of discretion to DOC by stating that the secretary "may authorize" EMP when it finds certain conditions are met for an incarcerated person and by allowing the secretary to revoke EMP at any time. And this permissive language does not require a specific outcome for a given set of facts. RCW 9.94A.728(1)(c)(i), (iv).

Therefore, Beckmeyer's rights under RCW 9.94A.728(1)(c) are limited to ensuring that DOC follows its own established policies regarding when inmates are eligible for EMP. *See Mattson*, 166 Wn.2d at 742. DOC has explained that although its written policies regarding the EMP review process recently have changed, DOC updated its policies when RCW

9.94A.728(1)(c) was amended in 2023. Beckmeyer has not shown DOC failed to follow an established policy. Accordingly, we hold that DOC's denial of Beckmeyer's EMP application did not violate his due process rights.

G.  MOTION FOR SANCTIONS

The State moved this court to impose sanctions on Beckmeyer's counsel under RAP 10.7 for not providing a fair statement of the facts in violation of RAP 10.3(a)(5), which states that a brief should contain "[a] fair statement of the facts and procedure relevant to the issues presented for review." The State complains that the statement of facts Beckmeyer's counsel provided failed to acknowledge most of the State's evidence at trial that opposed his theory of the case. But counsel had no obligation to provide the court with a completely neutral description of the facts. Accordingly, we deny the State's motion for sanctions.

CONCLUSION

We deny Beckmeyer's PRP and deny the State's motion for sanctions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

VELJACIC, A.C.J.

GLASGOW, J.

28